UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FELIPE ARROYO,

                                Petitioner,

                v.

STEWART ECKERT,
SUPERINTENDENT, WENDE
CORRECTIONAL FACILITY,

                                Respondent.

Case No. 18-cv-_____

MEMORANDUM OF LAW IN SUPPORT OF PETITION
FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

Christina Swarns
Anastasia B. Heeger AH-9640
OFFICE OF THE APPELLATE
DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100

Evan H. Stein (ES-2139)
HOLWELL SHUSTER &
GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
estein@hsgllp.com

*Attorneys for Petitioner*

## TABLE OF CONTENTS

I. INTRODUCTION.................................................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND ...........................................6

    A. The evidence presented at Petitioner's trial was mostly circumstantial. ............................6

    B. The testimony of Kevin Morrissey provided the only direct evidence of Petitioner's guilt.........................................................................................8

        1. Direct testimony..........................................................................9

        2. Cross-examination .....................................................................13

        3. Redirect testimony ....................................................................14

    C. Critical information about Morrissey was not brought out at trial. ..................................15

        1. Morrissey had an extensive history of mental health issues, including diagnoses of schizophrenia and psychosis....................................15

        2. Morrissey was a repeat jailhouse informant, including on behalf of the Bronx DA.............................................................................16

        3. The Bronx DA provided additional benefits to Morrissey beyond those disclosed in his cooperation agreement. .......................................18

        4. The Bronx DA failed to correct Morrissey's untruthful statement that his testimony would have no effect on his New Jersey sentencing.................................20

    D. Following his testimony at Petitioner's trial, Morrissey received favorable sentences in all jurisdictions where he faced criminal charges.........................................21

    E. Petitioner raised the constitutional claims at issue here in state-court postconviction proceedings, where they were rejected on the merits..............................21

III. JURISDICTION AND VENUE ........................................................................24

IV. TIMELINESS.................................................................................................24

V. SUMMARY OF CLAIMS ...............................................................................25

VI. EXHAUSTION ...............................................................................................26

VII. LEGAL STANDARDS ...................................................................................26

    A. The Antiterrorism and Effective Death Penalty Act.......................................................26

B. Petitioner's constitutional claims ...........................................................................27

   1. Brady v. Maryland .....................................................................................27

   2. Napue v. Illinois........................................................................................28

   3. Strickland v. Washington ...........................................................................29

**VIII. ARGUMENT** ............................................................................................**29**

A. The 440 Court unreasonably applied Brady when it found the Bronx DA was not duty bound to disclose the full extent of its efforts to help Morrissey. ...........................29

   1. The evidence concerning the Bronx DA's efforts to help Morrissey was favorable to Petitioner...............................................................................30

   2. The evidence was not disclosed..................................................................38

   3. The evidence is material and Petitioner was prejudiced by its non-disclosure...........39

B. The prosecution's failure to correct the false testimony it elicited from Morrissey violated Petitioner's constitutional rights under Napue.......................................................45

C. Petitioner's trial counsel was ineffective for failing to uncover Morrissey's history of mental illness. ..............................................................................................48

   1. Petitioner's trial counsel was deficient for failing to uncover Morrissey's mental health history.................................................................................49

   2. Trial counsel's ineffectiveness greatly prejudiced Petitioner. .....................................52

**IX. CONCLUSION** .........................................................................................**54**

## TABLE OF AUTHORITIES

## Cases

*Banks v. Dretke*,
    540 U.S. 668 (2004) ................................................................ 31, 42

*Benn v. Lambert*,
    283 F.3d 1040 (9th Cir. 2002) ....................................... passim

*Boyette v. Lefevre*,
    246 F.3d 76 (2d Cir. 2001) ................................................... 27

*Brady v. Maryland*,
    373 U.S. 83 (1963) ................................................................ 3, 27

*Burt v. Aleman*,
    2008 WL 1927371 (E.D.N.Y. Apr. 30, 2008) ................ 41, 43

*Carriger v. Stewart*,
    132 F.3d 463 (9th Cir. 1997) ............................................... 42

*Cohen v. Albert Einstein Med. Ctr.*,
    592 A.2d 720 (1991) ............................................................. 52

*Cullen v. Pinholster*,
    563 U.S. 170 (2011) ............................................................... 6

*Drake v. Portuondo*,
    553 F.3d 230 (2d Cir. 2009) ...................................... 28, 46, 48

Drumgold v. Callahan,
    707 F.3d 28 (1st Cir. 2013) ................................................. 33

Dubose v. Lefevre,
    619 F.2d 973 (2d Cir. 1980) ................................................ 38

*East v. Johnson*,
    123 F.3d 235 (5th Cir. 1997) ............................................... 52

*Evans v. Chavis*,
    546 U.S. 189 (2006) ............................................................. 25

*Fuentes v. T. Griffin*,
    829 F.3d 233 (2d Cir. 2016) ................................................ 53

*Giglio v. United States*,
405 U.S. 150 (1972)..................................................................................... 28, 30

*Gonzalez v. Wong*,
667 F.3d 965 (9th Cir. 2011) ....................................................................... 52, 53

*Green v. Lee*,
964 F. Supp. 2d 237 (E.D.N.Y. 2013) ................................................................. 49

*Greiner v. Wells*,
417 F.3d 305 (2d Cir. 2005)............................................................................... 49

*Guzman v. Sec'y, Dep't of Corr.*,
663 F.3d 1336 (11th Cir. 2011) ......................................................................... 33

*Harrington v. Richter*,
562 U.S. 86 (2011)............................................................................................. 29

*Hill v. Mitchell*,
2012 WL 995280 (S.D. Ohio Mar. 23, 2012) ..................................................... 39

*Jackson v. Brown*,
513 F.3d 1057 (9th Cir. 2008) ........................................................................... 31

*Jones v. Stinson*,
229 F.3d 112 (2d Cir. 2000)............................................................................... 26

*Jones v. Vacco*,
126 F.3d 408 (2d Cir. 1997)............................................................................... 26

*Kimmelman v. Morrison*,
477 U.S. 365 (1986)........................................................................................... 49

*Kyles v. Whitley*,
514 U.S. 41, (1995) ..................................................................................... 40, 50

*LaCaze v. Warden Louisiana Corr. Inst. for Women*,
645 F.3d 728, (5th Cir. 2011) ........................................................................... 43

*Lambert v. Beard*,
537 F. App'x 78 (3d Cir. 2013) ......................................................................... 41

*Lee v. United States*,
343 U.S. 747 (1952)............................................................................................. 1

*Lewis v. Comm'r of Correction*,
   975 F. Supp. 2d 169 (D. Conn. 2013)................................................... 27

*Lewis v. Conn. Comm'r of Correction*,
   790 F.3d 109 (2d Cir. 2015)........................................................ 27, 39

*Madera v. Superintendent, Livingston Corr. Facility*,
   281 F. Supp. 3d, 402 (S.D.N.Y. 2017)................................................. 24

*Mask v. McGinnis*,
   233 F.3d 132 (2d Cir. 2000)........................................................ 26, 39

*Maxwell v. Roe*,
   628 F.3d 486 (9th Cir. 2010) ........................................................ 43

*Mooney v. Holohan*,
   294 U.S. 103 (1935)................................................................. 28

*Napue v. Illinois*,
   360 U.S. 264 (1959)............................................................... 3, 28

*Panetti v. Quarterman*,
   551 U.S. 930 (2007)................................................................. 27

*People v. Arroyo*,
   18 N.Y.3d 955 (2012)............................................................... 21

*People v. Arroyo*,
   88 A.D.3d 495 (2011) ............................................................... 21

*Rompilla v. Beard*,
   545 U.S. 374 (2005)............................................................... 29, 49

*Shabazz v. Artuz*,
   336 F.3d 154 (2d Cir. 2003)......................................................... 41

*Shih Wei Su v. Filion*,
   335 F.3d 119 (2d Cir. 2003)............................................... 29, 46, 47, 55

*Silva v. Brown*,
   416 F.3d 980 (9th Cir. 2005) ............................................... 41, 42, 54

*Simmons v. Beard*,
   590 F.3d 223 (3d Cir. 2009)......................................................... 39

*Singh v. Prunty,*
    142 F.3d 1157 (9th Cir. 1998) ........................................................ 33, 36

*Sivak v. Hardison,*
    658 F.3d 898 (9th Cir. 2011) ............................................................. 37

*Smith v. Cain,*
    565 U.S. 73 (2012).......................................................................... 27, 40

*Strickland v. Washington,*
    466 U.S. 668 (1984)......................................................................... 4, 29

*Strickler v. Greene,*
    527 U.S. 263 (1999 ............................................................................ 30

*Thomas v. Kuhlman,*
    255 F. Supp. 2d 99 (E.D.N.Y. 2003) .................................................. 28

*United States v. Agurs,*
    427 U.S. 97 (1976)............................................................................. 28

*United States v. Bagley,*
    473 U.S. 667 (1985).......................................................................... 37, 38

*United States v. Boyd,*
    55 F.3d 239 (7th Cir. 1995) ............................................................. 33, 34

*United States v. Butt,*
    955 F.2d 77 (1st Cir. 1992)................................................................ 52

*United States v. Gil,*
    297 F.3d 93 (2d Cir. 2002)................................................................. 27

*United States v. Helmsley,*
    985 F.2d 1202 (2d Cir. 1993)............................................................. 28

*United States v. Jackson,*
    345 F.3d 59 (2d Cir. 2003)................................................................. 27

*United States v. Lindstrom,*
    q698 F.2d 1154 (11th Cir. 1983) ....................................................... 53

*United States v. Sipe,*
    388 F.3d 471 (5th Cir. 2004) ...................................................... 33, 34, 43

*United States v. Williams*,
81 F.3d 1434 (7th Cir. 1996) ........................................................... 33

*Wearry v. Cain*,
136 S. Ct. 1002 (2016) ................................................. 27, 30, 39, 40

*Wilkins v. Kirkpatrick*,
2009 WL 3644082 (S.D.N.Y. Nov. 4, 2009) ................................... 25

*Williams v. Artuz*,
237 F.3d 147 (2d Cir. 2001) ........................................................... 24

*Wilson v. Beard*,
589 F.3d 651 (3d Cir. 2009) .......................................... 30, 39, 51, 52

*Wilson v. Sellers*,
584 U.S. __, No. 16-6855 (U.S. Apr. 17, 2018) ............................. 26

*Wisehart v. Davis*,
408 F.3d 321 (7th Cir. 2005) ......................................................... 33

*Woods v. Etherton*,
136 S. Ct. 1149 (2016) ................................................................... 27

*Ylst v. Nunnemaker*,
501 U.S. 797 (1991) ....................................................................... 26

## Statutes

28 U.S.C. § 2241(d) ............................................................................. 24

28 U.S.C. § 2244 .................................................................................. 24

28 U.S.C. § 2244(d)(2) ........................................................................ 25

28 U.S.C. § 2254(a) ............................................................................. 27

28 U.S.C. § 2254(b)(1)(A) ................................................................... 26

28 U.S.C. § 2254(d) ............................................................................. 26

28 U.S.C. § 2254(d)(1) ........................................................................ 26

28 U.S.C. § 2254(d)(2) ........................................................................ 26

N.Y. Crim. Proc. Law § 410.91(1) ..................................................... 17

New York Criminal Procedure Law § 440.10 ..................................... 22

S.D.N.Y. Local Rule 21 ...................................................................... 24

# I.    <u>INTRODUCTION</u>

Petitioner Felipe Arroyo seeks a writ of habeas corpus because he was convicted after a trial tainted by numerous violations of his constitutional rights, including his right to receive notice of exculpatory evidence known to the prosecution, and his right to the effective assistance of counsel.  Petitioner presented his claims to the appropriate state court, which rejected them on the merits.  In doing so, the state court unreasonably applied clearly established Supreme Court law, and made unreasonable determinations of fact.  For those reasons, and because Petitioner has shown entitlement to relief on the merits of his claims, the writ should issue and Petitioner should be ordered released from his unconstitutional detention unless the state retries him within sixty days.

Petitioner was charged with murdering his girlfriend, convicted in Bronx Supreme Court of murder in the second degree, and sentenced to twenty-five years to life in prison.  Petitioner's conviction was based on evidence that was wholly circumstantial except for the testimony of one witness: Kevin Morrissey.  Morrissey testified that Petitioner—who did not know Morrissey prior to being incarcerated—had confessed to killing his girlfriend while the two men shared a holding cell at the Bronx Criminal Courthouse for several hours.

While the "dirty business" of jailhouse informants always presents the risk of false testimony and wrongful convictions, *Lee v. United States*, 343 U.S. 747, 757 (1952), Morrissey was a uniquely and extraordinarily unreliable witness.  Morrissey had an extensive history of mental illness, including diagnoses for schizophrenia and psychosis—mental illnesses so severe that he reported that his body was inhabited by another person.  Morrissey was also a repeat criminal offender, having been convicted of at least twenty crimes prior to Petitioner's trial, many of those crimes involving dishonesty or fraud.  And at the time of Petitioner's trial,

1

Morrissey was awaiting sentencing on felony charges in five separate jurisdictions, for which he potentially faced lengthy prison sentences.

Morrissey was not only a repeat criminal offender, but a repeat jailhouse informant. That Petitioner would confess to Morrissey—with whom he had only a fleeting acquaintance—is remarkable in itself. But just months before he testified at Petitioner's trial, Morrissey testified in another homicide case prosecuted by the Bronx DA, and claimed that the defendant in that case, too, had confessed to him while they were jailed together. It strains credulity that Morrissey—a diagnosed schizophrenic and serial fraudster—would fortuitously turn confessor to the targets of two Bronx murder prosecutions in a span of mere months. And those were not the only cases where Morrissey had testified as an informant.

Morrissey's credibility as a witness in Petitioner's trial was further undermined by the benefits the Bronx DA provided and agreed to provide to him in exchange for his testimony against Petitioner. These benefits included an agreement to recommend that Morrissey receive a lenient sentence on one of his pending felony charges. The benefits also included the Bronx DA's efforts, prior to Petitioner's trial, to help Morrissey in his quest for lenient sentences in another jurisdiction in which he faced felony charges. Moreover, in response to Morrissey's plea, the Bronx DA sought (albeit unsuccessfully) to relocate Morrissey's wife (who had been threatened as a result of Morrissey's prior role as an informant for the Bronx DA). Ultimately, despite his lengthy criminal record, Morrissey got what he was hoping for: a sentence in a drug rehabilitation program for each of his New York felony charges, and a non-custodial sentence in the fifth jurisdiction.

Particularly because of the importance of Morrissey's, at best, highly questionable testimony and credibility in general, the prosecution should have proceeded with the utmost

transparency and rigorous adherence to its constitutional obligations: (1) under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose all evidence that could be used to impeach Morrissey, and (2) under *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959), to correct any false statements Morrissey made on the stand.  But the prosecution failed to do so.

First, while the prosecution disclosed the existence of a written cooperation agreement with Morrissey (which required the government to assist Morrissey in his efforts to obtain leniency *after* his testimony in Kings County, one of the five jurisdictions in which he faced criminal charges), it failed to disclose the full extent of the assistance it provided to Morrissey *prior to* Petitioner's trial, which included phone calls made by the prosecution to the Queens County District Attorney's Office on Morrissey's behalf to secure a lenient sentence.  Also prior to trial, Morrissey sought the intercession of the prosecution in connection with a matter of such urgency to Morrissey—relocating his wife because of threats to her safety—that his attorney told the prosecutor that Morrissey would not testify unless the prosecution helped relocate his wife. The prosecutor endeavored to do just that, but wholly and unconscionably failed to disclose to Petitioner its efforts to help Morrissey's wife.  The prosecution's failure to disclose this evidence, which Petitioner, of course, could have used to impeach Morrissey, was highly prejudicial given that Morrissey provided the only direct evidence of Petitioner's guilt and his credibility was thus a critical issue at trial.  These failures to disclose exculpatory evidence violated Petitioner's rights under *Brady*.

Second, the jury was not only left in the dark as to critical facts bearing on Morrissey's credibility, it was also misled by false testimony from Morrissey and the prosecution's failure to correct that testimony.  On the stand, Morrissey tried to downplay the effect that his testimony at Petitioner's trial would have on the sentencing that he would soon face in a criminal case in New

Jersey, stating that his testimony would have no effect—"none whatsoever"—on that sentencing. But as the prosecutor knew, that was not true. Indeed, under a written agreement between the government and Morrissey, the prosecutor was obligated to bring Morrissey's cooperation to the attention of the New Jersey authorities, and in fact did so shortly after Morrissey's testimony concluded. (Morrissey ultimately received leniency in his New Jersey sentence on the basis of his cooperation. (S-490).) The prosecutor nevertheless failed to correct Morrissey's testimony, and therefore violated Petitioner's rights under *Napue*.

Finally, Petitioner's constitutional rights were violated by his attorney's failure to exercise due diligence to obtain evidence devastating to Morrissey's credibility: his extensive mental health issues, including his schizophrenia and psychosis diagnoses. Given the centrality of Morrissey's testimony and credibility, any competent counsel would have obtained this evidence because all that needed to be done was look into Morrissey's criminal record. Given the critical importance of Morrissey's testimony, and the tremendous impeachment value of this evidence—including evidence that Morrissey may have struggled with "distinguishing fact from fantasy and may have [had] his memory distorted by delusions, hallucinations, and paranoid thinking" (S-236)—trial counsel's failure constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

Petitioner presented each of his constitutional claims to the state court, but it rejected all of them. Because the state court's decision involved unreasonable applications of law and unreasonable determinations of fact, that decision is not entitled to deference, and the writ should issue.

As to Petitioner's *Brady* claim, the state court inexplicably failed to understand both the relevance and impeachment value of the undisclosed evidence concerning the benefits given to

Morrissey, and thus failed to reasonably apply *Brady*. Critically, the state court applied the wrong constitutional standard to Petitioner's *Brady* claims by requiring Petitioner to prove to a *certainty* that disclosure of the evidence "would have" changed the result of his trial. The Supreme Court has instructed, however, that the non-disclosure of evidence need only "undermine confidence" in the jury's verdict. Had the state court applied the right standard, it could not reasonably have rejected Petitioner's claim.

As to Petitioner's *Napue* claim, the state court failed to understand that Morrissey's testimony, which denied any connection between his testimony and his New Jersey criminal case, was false. It instead relied on the fact that Morrissey did not know at the time of trial what his exact sentence or sentencing range likely would be in New Jersey. But the state court missed the point. Morrissey gave materially misleading testimony, and the prosecution's obligation to correct it applied with special force here because the relevant facts, well known to the prosecutor, had not been fully disclosed to Petitioner. Because the state court's determinations of fact were unreasonable in these respects, and its application of *Napue* contravened clearly established law, the writ should issue on this basis as well.

As to Petitioner's *Strickland* claim, the state court's failure to understand the importance of the missing evidence at least borders on the irrational. It unreasonably and confoundingly concluded that the evidence that Morrissey had been diagnosed (1) with schizophrenia, as well as a host of other mental illnesses, and (2) as a "malingerer," somehow combined to prove that Morrissey was "not psychotic." (Ex. 1 at 17). One plus one does not equal zero. Moreover, the state court unreasonably applied *Strickland*: although it correctly held that Petitioner's counsel could have discovered the evidence with due diligence, it failed to recognize the immense value of that evidence. Contrary to the state court's holding, there was not and could not be any

"strategic" justification for counsel's failure to seek and obtain this evidence devastating to Morrissey's credibility. The state court's clearly erroneous holding was infected by its unreasonable determination of fact and application of law, and the writ should issue on this ground as well.

These constitutional violations must be remedied. Each of the violations went to the credibility of the prosecution's key witness, whose testimony constituted the only direct evidence of Petitioner's guilt. The violations were highly prejudicial to Petitioner and resulted in a constitutionally defective trial and conviction.

Because the state court's decisions denying Petitioner relief unreasonably applied clearly established Supreme Court law and involved unreasonable determinations of fact, and because Petitioner's continued custody is in violation of the United States Constitution, the Court should grant the petition and issue a writ of habeas corpus.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

Petitioner was arrested on November 18, 2006, for the murder of Lucy Alvarado, his girlfriend. (S-227). He was charged with second-degree murder, and his trial began on February 19, 2008.

### A.     The evidence presented at Petitioner's trial was mostly circumstantial.

On the evening of November 18, 2006, Ms. Alvarado's body was discovered at the Bronx home she shared with Petitioner. Three of Ms. Alvarado's four children, as well as her mother,

---

[1] All facts are drawn from the record presented to the state courts. *See Cullen v. Pinholster*, 563 U.S. 170, 203 (2011). All record citations refer to the exhibits to the Petition. That record was provided to the state courts in three volumes, with pagination beginning with "S-", "A-", or "T-". These volumes have been attached to the Petition with the same pagination. Exs. 2-4. The state post-conviction court's decision and order is attached as Exhibit 1. That decision often references the trial transcript or the transcript of the hearing conducted before that court. These transcripts have also been attached separately to the Petition. Exs. 5-6.

lived in the home. (Ex. 6 at 77). Ms. Alvarado's mother, Lucilla Brillon, found her daughter's body lying face down on her bed; Ms. Alvarado had been hit on the head and the bedroom was covered in blood. (Ex. 6 at 299). The medical examiner testified that Ms. Alvarado had likely died between 9:00 p.m. on November 17 and noon on November 18. (Ex. 6 at 569-577, 616-617). Ms. Alvarado's body was bloody and bruised when it arrived at the coroner's office. (Ex. 6 at 556). She had multiple lacerations on her face and head caused by blunt impact injuries. (Ex. 6 at 557-558). Ms. Alvarado died as a result of this blunt force injury to her head. (Ex. 6 at 563).

Ms. Brillon testified that Petitioner had been with Ms. Alvarado on the evening of November 17. Specifically, Brillon testified that she heard Petitioner and Ms. Alvarado come home around 10:00 p.m., which woke her up, and later saw the pair "playing with the television," by which she meant playing video games. (Ex. 6 at 297, 304-307). Although Petitioner and Ms. Alvarado had an argument the day before and Ms. Alvarado had asked Petitioner to leave the home, he had stayed anyway. (Ex. 6 at 326-327).

One of Ms. Alvarado's daughters testified that she and her sister had slept at their eldest sister's home. (Ex. 6 at 58-59). Ms. Alvarado's son had stayed home with Brillon and fell asleep with Brillon in her bed at some point before 10:00 p.m. (Ex. 6 at 304).

Nancy Quinones, Petitioner's ex-girlfriend and the mother of his children, testified that Petitioner had called her at around 6:00 a.m. on November 18 asking to see his children. (Ex. 6 at 138-144). In addition, Petitioner's sister-in-law testified that Petitioner came to her apartment at around 7:00 a.m., but did not speak to her. (Ex. 6 at 158-160). Petitioner's sister testified that he came to her apartment at 10:00 a.m. and that he did not have any blood on his clothes, and that he had brought beer with him to her apartment. (Ex. 6 at 632, 645).

That evening around 5:30 p.m., Ms. Alvarado's body was found. Petitioner was arrested that night after police traced another call he made to Ms. Quinones around 9:00 p.m. while police were at her residence. The arresting officers testified that Petitioner appeared intoxicated. Petitioner did not confess to the murder. Rather, he said only that, "If I did something, I don't remember it." (Ex. 6 at 234).

Investigating detectives inspected Ms. Alvarado's home and found no signs of forced entry. (Ex. 6 at 202-203). They also found Petitioner's fingerprints on beer bottles in the bedroom shared by Petitioner and Ms. Alvarado. (Ex. 6 at 256-257). The police did not recover a murder weapon. (Ex. 6 at 257).

The prosecution's theory of the case was that Petitioner killed Ms. Alvarado out of jealousy. Ms. Alvarado's children testified that she and Petitioner argued frequently in the home, and that Petitioner had threatened to kill her during an argument one month prior to her death. (Ex. 6 at 383-384, 388). Angel Torres, Ms. Alvarado's nephew, said that Petitioner had threatened to "break open" Ms. Alvarado's head. (Ex. 6 at 41-42). According to the testimony of multiple witnesses, including one of Ms. Alvarado's daughters, Petitioner had often accused Ms. Alvarado of infidelity. (Ex. 6 at 370).

**B.    The testimony of Kevin Morrissey provided the only direct evidence of Petitioner's guilt.**

In contrast to the foregoing circumstantial evidence, the testimony of Kevin Morrissey, the prosecution's cooperating witness, provided the only direct evidence of Petitioner's guilt. Specifically, Morrissey testified that Petitioner confessed to Ms. Alvarado's murder while the two shared a cell at the Bronx County Criminal Courthouse. Morrissey's testimony, including his direct and redirect testimony elicited by Bronx County Assistant District Attorney Aaron

Kaplan, and Petitioner's counsel's cross-examination of Morrissey, is discussed in more detail below.

### 1. *Direct testimony*

Morrissey testified that he had first met Petitioner in Riker's Island in February 2007, several months after Petitioner's arrest. (A-162). Petitioner had slept "about four to five feet away" from Morrissey in the dorm where they were both housed, and the two men spoke about their respective charges. (A-162 to A-163).

According to Morrissey, Petitioner suddenly confessed to him several months later, in June 2007, when the two men were being held in the "bullpens" in the Bronx County Criminal Courthouse while waiting to appear in court. (A-164 to A-165). Morrissey had been brought to the Bronx to meet with the Bronx DA's office regarding another homicide case in which he was testifying as an informant. (A-165 to A-166). After Petitioner asked why Morrissey was being held at the Bronx County Criminal Courthouse that day, Morrissey said that he "had a charge in the Bronx," which he admitted was not a "truthful statement." (A-166).

Morrissey claimed that Petitioner, without prompting, told him that he had killed his girlfriend "Lucy." (A-169). Petitioner was "gleeful" because "he seemed to feel he was going to walk away on this case" because "there was no direct evidence against him." (A-169). Specifically, the police "didn't find any fingerprints in the house or anything like that." (A-171).

According to Morrissey, Petitioner then "discussed the particulars of the case with" him. (A-169). Petitioner told him the following: that he was living with Ms. Alvarado in an apartment in the Bronx on Shakespeare Avenue (A-169); that Ms. Alvarado had called the cops on Petitioner and Petitioner had moved out of the house as a result (A-170); that Petitioner "thought [Ms. Alvarado] was having an affair" with another man who was "either the super of the building" or "the person [Petitioner] sold his van to" (A-170); and that Petitioner believed the

man was supplying Ms. Alvarado with heroin. (A-170). Petitioner and Ms. Alvarado did live on

Shakespeare Avenue. And with respect to Petitioner's belief that Ms. Alvarado had been

cheating on Petitioner with the superintendent of their building (who they had also sold a van to),

testimony from one of Ms. Alvarado's children indicated that Petitioner had accused Ms.

Alvarado of cheating on him with a man the pair sold a van to. (Ex. 6 at 369-370). Roberto

Montanez, who had purchased the van, also testified at the trial that he was a building

superintendent. (Ex. 6 at 427). In addition, Petitioner accused him of sleeping with Ms.

Alvarado the day he purchased the van. (Ex. 6 at 428-429). Ms. Alvarado's alleged heroin use

was corroborated in part by the medical examiner, who said that Ms. Alvarado had methadone in

her system, which is "commonly administered to people who have had heroin addictions in the

past." (Ex. 6 at 565-566).

Morrissey further claim that Petitioner told him that on the night of Ms. Alvarado's death

he had been drinking with friends and went to the apartment to convince Ms. Alvarado to let him

move back in. (A-170). According to Morrissey, Petitioner told him that when Ms. Alvarado

threatened to call the police, Petitioner "picked up a banger and hit her in the head," and that

there was "blood all over the place." (A-170). Morrissey said that a "banger" was "a knife, club,

pipe, stick, billy stick, [or] a blackjack." (A-179). Finally, Morrissey claimed that Petitioner

told him that he then put Ms. Alvarado "into the bed," left the apartment, and was arrested "a

few weeks later." (A-171).

In numerous respects, Morrissey's testimony about what Petitioner supposedly told him

was at odds with other evidence. For example, the statement Morrissey imputed to Petitioner

with respect to his fingerprints not being found at the scene was inconsistent with other

testimony, which showed that fingerprints had been lifted from beer bottles found in Ms.

Alvarado's bedroom.[2]  And Morrissey's testimony that Petitioner had been kicked out of the home on the day of the murder, and that his return to the home initiated a fight with Ms. Alvarado, was in direct conflict other testimony, specifically Brillon's testimony that Ms. Alvarado and Petitioner had returned home *together* that night at around 10:00 p.m., and had played games on the television for the next few hours.  In addition, Ms. Alvarado's daughter testified that Petitioner had been with Ms. Alvarado earlier in the day as well, indicating that he had not been kicked out of the home at that time (Ex. 6 at 385), and Brillon had also testified that Petitioner had *not* left the home after he and Ms. Alvarado had a fight the day before her death (Ex. 6 at 326-327).  Another example of Morrissey's testimony being rebutted by undisputed fact is his claim that Petitioner told him he had been arrested "a few weeks" after the murder.  In fact, Petitioner had been arrested the day of or the day after the murder.  (A-171).

Morrissey did not tell anyone about the alleged confession until months later, on September 21, 2007, when he wrote a letter to a U.S. Marshal in which he claimed that he "couldn't sit with this." (A-174, 177).  Eventually, Morrissey met with ADA Aaron Kaplan, the prosecutor assigned to Petitioner's case, toward the end of September or early October 2007. (A-175).  According to Morrissey, at that initial meeting, no promise was made to him in return for his testimony at Petitioner's trial, and he was prepared to testify solely because "it's the right thing to do." (A-178).  In his letter to the U.S. Marshal, Morrissey said that Petitioner had told him that he had been with his sister and drinking buddies prior to the murder, but had left them to go to Ms. Alvarado's apartment.  (A-195).  This testimony also conflicts with the testimony discussed above that Petitioner and Ms. Alvarado had returned together to the apartment that night.

---

[2] Given that Petitioner lived in the home with Ms. Alvarado, the notion that Petitioner's fingerprints would not have been found at the home was inexplicable.

Morrissey also told the jury that, at the time of Petitioner's trial, he was facing felony charges, including grand larceny, in five different jurisdictions, and that he previously had been convicted of twenty to thirty crimes, all of which were "basically . . . financial crimes" committed to support his "drug problem." (A-154). He stated that he was currently in custody, and that he had pled guilty to four of his five currently pending felony charges, including charges in Brooklyn, Queens, Nassau, and Suffolk Counties in New York. (A-155). The only a charge he had not yet pled guilty to was a charge he faced in Bergen County, New Jersey, that "involve[ed] an automobile." (A-155). Morrissey had not yet been sentenced in any of his New York cases because, in Morrissey's words, his sentencing was "pending my testimony here." (A-156). When asked what his minimum sentence for those crimes was, he answered "two to four," with a maximum of "three-and-a-half to seven years." (A-157).

Morrissey next testified about a cooperation agreement he had signed with the Kings County and Bronx County DA offices. (A-158; *see also* A-112 to A-115 (cooperation agreement)). Morrissey said that, "in essence," the agreement called for his truthful testimony in Petitioner's case in exchange for the Bronx DA's "recommendation as to the minimum sentence, but there are no guarantees." (A-159). Morrissey elaborated that "nobody has promised me any specific sentence or any specific time cut on any of the sentences." (A-159). But the written cooperation agreement between Morrissey and the prosecutors stipulated that in exchange for his testimony at Petitioner's trial, the Kings DA would recommend that Morrissey receive a "lesser sentence" in Kings County of "2-4 years incarceration, or the Willard Program" (A-113 at ¶ 7), to run concurrently to his other sentences (A-112 to A-115 (cooperation agreement)).

In addition, the agreement explained that *after* testifying at Petitioner's trial, Morrissey's cooperation with the Bronx DA would be made known to Kings County, as well as to other

jurisdictions. (A-114 at ¶ 12). Nothing in the agreement required ADA Kaplan to do anything, or provide *any* benefit to Morrissey, *before* Morrissey testified at Petitioner's trial.

Morrissey also testified regarding the "Willard" drug treatment program, which he described as a "boot camp type of environment" that is "highly restrictive." (A-160). When asked how the Willard drug treatment program had been "incorporated within the agreement," Morrissey stated that Willard had been "listed" in the written agreement as a possible sentence in the event of his truthful testimony. (A-160). ADA Kaplan then asked Morrissey "if you go into that Willard drug treatment program, how much time *additionally* will you have to serve in jail?" (A-161 (emphasis added)). Morrissey responded "it's at least another six months." (A-161). With respect to his charges in Queens County, Morrissey had not received "a specific promise" as to his sentence, but his truthful testimony would lead to the "minimum sentence, which would be the two to four, which I will serve approximately twenty-two months on." (A-163).

2. ***Cross-examination***

Petitioner's counsel conducted an, at best, cursory cross-examination, which covered a mere 15 pages in the trial transcript. (A-196 to A-210).

Petitioner's counsel first questioned Morrissey about the "twenty to thirty" convictions he had for forging checks using fake names. (A-196). Counsel then asked Morrissey about the five then-pending felony charges in Queens, Brooklyn, Suffolk, and Nassau Counties in New York, and Bergen County in New Jersey. (A-202). Morrissey confirmed that he had a "sentence pending" in each of those jurisdictions. (A-202). Morrissey was asked about the difference between a "consecutive" sentence and a "concurrent" one, and stated that all of his sentences would run "concurrently." (A-203 to A-204). Morrissey asserted that this was not the result of his written agreement with the Bronx DA's office. (A-204).

Petitioner's counsel then asked Morrissey about his "cooperation" with the prosecution in the past.  (A-205).  Morrissey stated that "the majority of [his] cooperation" had "been done with the federal government."  (A-205).  In total, Morrissey estimated that he had given information to law enforcement authorities in "about" seven to ten cases, including one homicide case that resulted in a conviction.  (A-206 to A-207).

Counsel then asked Morrissey about his June 2007 conversation with Petitioner and subsequent decision to act as an informant; this portion of the cross-examination covers just two pages in the trial transcript.  (A-207 to A-208).  When Morrissey began to go into more detail about the other homicide case in which he had acted as an informant, Petitioner's counsel cut him off, saying "that's enough."  (A-209).

### 3. *Redirect testimony*

On redirect, ADA Kaplan attempted to shore up his witness's credibility with questions about the connection between Morrissey's testimony and his sentence in New Jersey:

> Q: You mentioned on cross-examination the Bergen County case, remember that?
>
> A: Bergen County case, correct.
>
> Q: Have you even pleaded guilty on that case yet?
>
> A: No. I've been trying to though.
>
> Q: But you haven't pleaded guilty yet?
>
> A. No.
>
> Q: Do you have any idea whether or not what you do in this courtroom has any relationship to Bergen County?
>
> A: None whatsoever.

(A-211 to A-212).  Kaplan did not correct this testimony, which (as discussed below) was not true.

C. **Critical information about Morrissey was not brought out at trial.**

Given that Morrissey's testimony was the only direct evidence of Petitioner's guilt, the reliability of that testimony was a critical issue at trial. But Morrissey's testimony did not reveal the full extent to which he had an incentive to testify favorably for the prosecution, or his profound unreliability as a witness. The jury knew nothing whatsoever about his documented and extensive history of mental illness, never learned about his history as a jailhouse informant for the Bronx DA, and never heard the full extent of the benefits he received from the prosecution for his testimony against Petitioner.

1. *Morrissey had an extensive history of mental health issues, including diagnoses of schizophrenia and psychosis.*

Prior to Petitioner's trial, Morrissey had been diagnosed—over a span of at least fifteen years—with psychosis, psychotic disorder, schizophrenia, addiction, depression, memory problems, confusion, auditory hallucinations, and cocaine addiction. (S-181, S-191 to S-192, S-194, S-203 to S-204, S-212).

Morrissey's mental illness had been discussed at proceedings in various cases. In a 1993 case, Morrissey's schizophrenia diagnosis was noted multiple times. (S-233). At the time of that case, Morrissey himself stated that he was taking "11 different medications to control my mental illness," including an "antipsychotic." (S-233). In a different 1993 case, the judge reviewed a psychiatric report and determined that Morrissey was a "faker, a malingerer who lies for his own advantage, and that he is not to be trusted and simply manipulates medical matters for what he considers to be his own benefit." (S-234 to S-235).

The most recent schizophrenia diagnosis had come in 2007, only months before Morrissey claimed Petitioner had confessed to him. (S-212). That diagnosis arose in connection with Morrissey's conviction in Queens County—the same conviction that he discussed at

Petitioner's trial.  The record of that case contained an "After Care Letter" from Correctional Health Services stating that Morrissey had "Schizophrenia."  (S-212).  To treat his schizophrenia, Morrissey had been prescribed the drug Zyprexa.  (S-212, S-235).  Morrissey had also undergone competency evaluations in connection with charges against him in 1993, 2000, and 2007. (S-109, 110, 214, 235).

Morrissey himself had, in letters written to federal judges overseeing his criminal cases, claimed that a "another person" named "Ray Sanchez" lived "inside his body."  (S-154 (undated), S-156 (1992 letter)).  In one letter, Morrissey had stated that "only [Ray Sanchez]" was "doing all these bad illegal things."  (S-154, 156).

The jury did not hear any of this evidence.

> 2. ***Morrissey was a repeat jailhouse informant, including on behalf of the Bronx DA.***

Morrissey's cooperation with the Bronx DA in a prior case, *People v. Ricardo Jiminez*, was simply alluded to at Petitioner's trial; the full scope of that cooperation was not.  But that prior cooperation is critical to understanding the full (and undisclosed) range of benefits Morrissey received for his testimony in Petitioner's case.

Ricardo Jiminez was charged in Bronx County with murder and convicted, in part, on the basis of testimony from Morrissey, who acted as an informant for the Bronx DA.  In that case, too, Morrissey testified that the defendant had confessed to committing murder while the two shared a cell.  (A-082; A-075 to A-076; Ex. 5 at 171; *see also* Ex. 1 at 10).  At the time of Jiminez's trial, Morrissey faced the same set of five charges as he did during Petitioner's trial. As he explained on the stand at the Jiminez trial, Morrissey testified against Jiminez in exchange for a promise by the Bronx County ADA assigned to the Jiminez case—Lisa Mattaway— to call the Queens County DA's office.  (A-083 to A-086; *see also* Ex. 1 at 10).  Morrissey testified that

he hoped that the "outcome of the phone call" would be that "Queens would adjudicate the case the same as the other boroughs, but Queens is very tough." (A-085). Morrissey said that the other boroughs—Suffolk, Nassau, and Kings—had agreed to give him a sentence of one-and-a-half to three years. (A-079).

Ultimately, however, Morrissey's efforts failed, and he did not receive the help he was looking for from ADA Mattaway. According to a statement made by Morrissey in November 2014, he got "nothing" of value from Mattaway in exchange for his testimony. (S-616 at ¶ 8). Thus, after his testimony in the Jiminez case, Morrissey still faced felony charges in five jurisdictions and feared he might not receive what he coveted most: a "Willard" sentence.[3]

In August 2007 (after Petitioner's alleged confession but before Morrissey had told anyone about it), Morrissey pleaded guilty to his felony in Nassau County. The judge told Morrissey he would receive a two- to four-year sentence for grand larceny, as well as other, shorter sentences to run concurrently. Crucially, the judge made no mention of *Willard*. (A-268 to A-269).

Only after it was clear that he might not receive *Willard* did Morrissey claim in the letter to the U.S. Marshal—in which Morrissey said he "couldn't sit with" the information—that Petitioner had confessed to him. In other words, Morrissey alleged that when he and Petitioner shared a cell, Petitioner allegedly confessed to Morrissey that he had committed a murder, just as Jiminez had allegedly done only months earlier.

---

[3] Morrissey briefly described a *Willard* sentence at Petitioner's trial, but not in great detail. In New York criminal procedure, a *Willard* sentence is a three-month drug rehabilitation program that substitutes for a term of incarceration. *See* N.Y. Crim. Proc. Law § 410.91(1). Such a sentence, of course, is preferable to a lengthier term of incarceration. Despite Morrissey's best efforts in the Jiminez conviction, however, he could have potentially missed out on *Willard* and been sentenced to a lengthy term of incarceration.

3.  ***The Bronx DA provided additional benefits to Morrissey beyond those disclosed in his cooperation agreement.***

The jury also did not hear about the full efforts made by the Bronx DA to assist Morrissey prior to his testimony at Petitioner's trial.

a.  <u>The Bronx DA failed to disclose evidence related to its attempted efforts to assist Morrissey.</u>

In September 2007, shortly before meeting ADA Kaplan (the lead prosecutor in Petitioner's case) for the first time, Morrissey wrote to ADA Mattaway (the lead prosecutor in the Jiminez case) and informed her that he and his family had been receiving threats as a result of his cooperation in another case. He told Mattaway to "not take this lightly." Morrissey asked Mattaway to "get them safe." (A-088). Thereafter, Morrissey's wife called Mattaway and asked for help. (Ex. 5 at 197). Mattaway referred Morrissey's wife to the New York Crime Victims Assistance Unit ("CVAU"). (Ex. 5 at 197).

Mattaway also reached out to ADA Kaplan to inform him of the situation. On September 28, 2007, a day after meeting Morrissey for the first time, Kaplan set up a conference with CVAU to inquire further about helping Morrissey's wife relocate. (A-007; Ex. 5 at 49-50).

Even after ADA Kaplan undertook these efforts, one of Morrissey's attorneys, Norman Trabulus,[4] emailed Kaplan on October 27, 2007, and told him that Morrissey's wife had been told she was ineligible for help from the CVAU. And according to the attorney, this was unacceptable to Morrissey: in an email to Kaplan labeled "Important," Mr. Trabulus stated, "My best guess is that he will *not testify unless* she and the child are moved." (A-004 (emphasis added)). On October 30, 2007, Kaplan followed up again with the CVAU employee to find out if "in fact we are out of options," and made sure to copy Morrissey's attorney on the email. (A-

---

[4] Mr. Trabulus was not directly representing Morrissey in any of his five cases, but rather coordinating his cooperation with the Bronx DA's office.

004).  As Kaplan himself later acknowledged, he was Morrissey's "conduit" to CVAU.  (Ex. 5 at 30).

On January 18, 2008—ten days after Morrissey signed the written agreement with the Bronx and Kings DAs—the CVAU representative spoke one more time with Morrissey's wife, this time concerning Morrissey's wife's recent housing interview.  (A-007).  The CVAU representative followed up with ADA Kaplan that same day to inform him of the conversation with Morrissey's wife.  (A-007).  Thus, Kaplan was receiving updates on the status of assistance provided to Morrissey's wife by the CVAU as late as January 18, 2008, only a month before Petitioner's trial began.

The jury heard nothing about ADA Kaplan's efforts to assist Morrissey's wife at Morrissey's behest.

> **b.** The Bronx DA failed to disclose that ADA Kaplan called the Queens DA on Morrissey's behalf prior to Petitioner's trial.

ADA Kaplan made various calls to the Queens DA on Morrissey's behalf prior to Morrissey's testimony at Petitioner's trial.  These calls were not disclosed to Petitioner before trial, and the jury heard nothing about them.

The written agreement between the government and Morrissey did not call for any discussions between ADA Kaplan and other jurisdictions *prior* to Morrissey's testimony.  Nonetheless, prior to Petitioner's trial Morrissey's attorney emailed Kaplan to say that Morrissey was worried about the sentence he might face for his felonies in Queens County.  Specifically, Mr. Trabulus asked Kaplan to call the ADA in Queens and "ensure [Morrissey] gets Willard there too."  (A-116).  Kaplan immediately agreed to make the call, emailed back a few hours later to report his "substantive conversation" with the Queens ADA, that she was now "aware of all the Willard stuff," and that their conversation about Willard would continue once the time

came to sentence Morrissey in Queens.  (A-116 to A-118).  Mr. Trabulus emailed back that this

information "reassured" Morrissey.  (A-118).  Kaplan's calls to the Queens DA on Morrissey's

behalf prior to Petitioner's trial were not disclosed.

At some point thereafter, Kaplan also spoke with prosecutors in Suffolk and Nassau

Counties.  (Ex. 5 at 79-81).  Kaplan was asked about these calls at the CPL 440 hearing:

> Q:     Before trial, had you called a prosecutor in Nassau
>        County?
>
> A:     I believe I did.
>
> Q:     Do you recall when that was?
>
> A:     I do not.  I don't recall.  If, in fact, it happened, I
>        believe I did.
>
> Q:     Do you recall what you discussed?
>
> A:     No recollection.

(Ex. 5 at 79-80).  When asked about calls to Suffolk County, Kaplan said that "the same answer

applies."  (Ex. 5 at 80).

The jury heard none of this evidence concerning pre-trial, undisclosed efforts to assist

Morrissey in obtaining lenient sentences.

### 4. *The Bronx DA failed to correct Morrissey's untruthful statement that his testimony would have no effect on his New Jersey sentencing.*

The written agreement between Morrissey and the government, as noted, called for ADA

Kaplan to inform other jurisdictions of Morrissey's cooperation at Petitioner's trial after that

cooperation occurred.  (A-114 at ¶ 12).  That agreement covered the prosecutor's office in

Bergen County, New Jersey, where Morrissey faced criminal charges.  Nonetheless, ADA

Kaplan elicited from Morrissey on redirect the untruthful testimony that Morrissey's cooperation

at Petitioner's trial would have no connection—"none whatsoever"—to his sentencing in New Jersey. (A-212).

Moreover, immediately after Morrissey's testimony in Petitioner's trial, Mr. Trabulus emailed Kaplan to remind him of his obligation to call Bergen County, New Jersey, and report Morrissey's cooperation in Petitioner's trial, confirming that Kaplan had an obligation under the cooperation agreement to call the Bergen County DA after Morrissey's testimony. (A-217; Ex. 5 at 165). Indeed, Kaplan had communicated with the Bergen prosecutors before Petitioner's trial to verify the existence of Morrissey's charges. (Ex. 5 at 57). In response to Mr. Trabulus's "reminder," Kaplan promised to call the prosecutor in Bergen and to write a letter detailing Morrissey's cooperation in Petitioner's case, which he ended up doing. (A-217; A-372 to A-373; Ex. 5 at 58-62).

### D.  Following his testimony at Petitioner's trial, Morrissey received favorable sentences in all jurisdictions where he faced criminal charges.

Ultimately, following ADA Kaplan's assistance, Morrissey received the *Willard* sentence he coveted for each of his four New York convictions. (A-291 to A-299; A-306; A-224; S-723). In Bergen County, New Jersey, Morrissey received a non-custodial probation sentence. (A-354).

### E.  Petitioner raised the constitutional claims at issue here in state-court postconviction proceedings, where they were rejected on the merits.

Petitioner timely appealed his conviction to the Supreme Court, Appellate Division, First Department, which affirmed his conviction on October 13, 2011. *See People v. Arroyo*, 88 A.D.3d 495, 496 (2011). Petitioner then sought leave to appeal his conviction to the New York Court of Appeals, which was denied on March 6, 2012. *See People v. Arroyo*, 18 N.Y.3d 955 (2012).

Because the Bronx DA suppressed important evidence at trial, and because his counsel failed to discover Morrissey's history of mental illness, the claims underlying Petitioner's current petition were not a part of the record on direct appeal. Rather, Petitioner only learned through happenstance many of the crucial facts presented in this petition. These facts were primarily learned by Petitioner's appellate and post-conviction counsel, and post-conviction counsel in the Jiminez case.[5] After becoming aware of the basis for his present constitutional claims, Petitioner moved in Bronx County Supreme Court on April 27, 2012, to vacate his conviction under New York Criminal Procedure Law § 440.10 ("CPL § 440"), which provides for post-conviction relief.

Petitioner presented numerous claims to the Bronx County Supreme Court ("the 440 Court"), three of which are at issue in this petition.

First, Petitioner argued that the Bronx County DA violated *Brady* by failing to disclose the full extent of its efforts to assist Morrissey before Petitioner's trial. The 440 Court rejected Petitioner's *Brady* claim on the basis of its conclusion that the undisclosed evidence was neither favorable to Petitioner nor material. (The 440 Court's decision is attached as Ex. 1). The court found that the evidence that ADA Kaplan agreed to try to help Morrissey's wife relocate in advance of Petitioner's trial was not "favorable" to Petitioner because the Bronx DA was unable *actually* to move Morrissey's wife despite its best efforts (Ex. 1 at 22), and because ADA Kaplan testified at the 440 hearing that Morrissey said he was willing to testify despite the failure to move his wife (Ex. 1 at 22-23). The 440 Court also found that the evidence that ADA Kaplan made efforts to assist Morrissey in obtaining favorable sentences prior to Petitioner's trial that went beyond what was disclosed in the written cooperation agreement was not "favorable"

_____

[5] The Office of the Appellate Defender represented both Petitioner and Jiminez at the post-conviction stage, including on direct appeal.

because Kaplan did not "request that a specific sentence be imposed" in jurisdictions other than Kings County (Ex. 1 at 27), and any discussions between Kaplan and those jurisdictions were merely "logistical in nature" precisely because no specific sentence was requested (Ex. 1 at 28). Finally, the court held that the undisclosed evidence was not "material" because Petitioner could not show that "if the evidence [had] been disclosed to the defense, the result of the proceeding would have been different." (Ex. 1 at 18).

Second, Petitioner argued that ADA Kaplan violated *Napue* when he failed to correct untruthful testimony by Morrissey at Petitioner's trial. Specifically, Petitioner asserted that Morrissey had not testified truthfully as to the connection between his testimony and his pending criminal case in New Jersey, and that Kaplan failed to correct this false testimony. The 440 Court rejected Petitioner's *Napue* claim, finding that Morrissey had not lied about the effect of his testimony on his New Jersey case. The 440 Court did not, of course, find that there was no connection between Morrissey's testimony and his New Jersey case. Rather the 440 Court illogically reasoned that Morrissey had not lied because he did not know, at the time of his testimony, the *precise* sentence he would face in New Jersey. (Ex. 1 at 31).

Third, Petitioner argued that his trial counsel had been ineffective under *Strickland* for failing to uncover Morrissey's history of mental illness. The 440 Court rejected Petitioner's *Strickland* claim on the basis of its extraordinary and unreasonable finding that Morrissey's extensive record of mental health diagnoses, including schizophrenia and psychosis, showed that Morrissey was "not psychotic" because he had also been diagnosed as a "malingerer." (Ex. 1 at 17). In addition to this untenable finding, the 440 Court ruled that Petitioner failed to show "the absence of strategic or other legitimate explanations" for counsel's failure. (Unsurprisingly, the 440 Court did not posit any strategic or legitimate reasons for that failure.). Finally, the 440

Court concluded that Petitioner had failed to show that, even if counsel had uncovered the evidence, the result of the trial would have been different. (Ex. 1 at 35-36).

Following the denial of his section 440 motion, Petitioner applied for leave to appeal from the Appellate Division, First Department, which denied leave in a summary order on June 29, 2017.[6]

## III.    JURISDICTION AND VENUE

Petitioner was convicted in Bronx County, New York. He is currently in the custody of the State of New York at Wende Correctional Facility in Alden, New York. Petitioner properly brings this petition under 28 U.S.C. § 2254. Venue is proper in the Manhattan courthouse of the Southern District of New York. *See* 28 U.S.C. § 2241(d); S.D.N.Y. Local Rule 21.

## IV.    TIMELINESS

Petitioner's habeas petition is timely under the one-year statute of limitations prescribed by 28 U.S.C. § 2244(d). Petitioner's conviction became final on June 4, 2012, ninety days after his application for leave to appeal to the Court of Appeals was denied. *See Madera v. Superintendent, Livingston Corr. Facility*, 281 F. Supp. 3d, 402 (S.D.N.Y. 2017) ("A conviction becomes final 'when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s],' that is, ninety days after the final determination by the state court of appeals." (quoting *Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001))).

By the time his conviction became final in June 2012, Petitioner had already filed for state post-conviction relief under section 440.[7] As a result, no time elapsed for purposes of 28 U.S.C. § 2244 between Petitioner's conviction becoming final and his filing of the section 440

_____

[6] The summary decision denying leave to appeal can be found at
   http://www.nycourts.gov/reporter/motions/2017/2017_78659.htm

[7] Petitioner filed his 440 motion on April 27, 2012. (S-219).

24

motion. The one-year statute of limitations period was then tolled during the pendency of Petitioner's section 440 motion and while he timely sought leave to appeal its denial in the Appellate Division. *See* 28 U.S.C. § 2244(d)(2); *see also Wilkins v. Kirkpatrick*, 2009 WL 3644082, at *7 (S.D.N.Y. Nov. 4, 2009) ("The time that an application for state post-conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law." (quoting *Evans v. Chavis*, 546 U.S. 189, 191 (2006))).

Thus, the clock did not begin to run on the statute of limitations until June 29, 2017, when the Appellate Division denied leave to appeal. *Wilkins*, 2009 WL 3644082, at *7 ("[F]or purposes of calculating the tolling provision of § 2244(d)(2), AEDPA's one year statute of limitations is tolled from the date a petitioner files his or her 440.10 motion until the date the Appellate Division denies the petitioner leave to appeal that decision.").

Accordingly, the petition is timely because it has been filed before June 29, 2018.

## V. <u>SUMMARY OF CLAIMS</u>

Petitioner advances three constitutional claims under clearly established United States Supreme Court law:

1. *Brady* – the Bronx DA failed to disclose the efforts it made to assist Morrissey *prior to* Morrissey's testimony in Petitioner's trial. *See infra* section VIII.A.

2. *Napue* – the Bronx DA failed to correct Morrissey's false testimony at Petitioner's trial that Morrissey's cooperation would have no connection "whatsoever" to his New Jersey criminal case. *See infra* section VIII.B.

3. *Strickland* – Petitioner's trial counsel was ineffective for failing to uncover Morrissey's history of mental illness. *See infra* section VIII.C.

## VI.    EXHAUSTION

Petitioner robustly raised his constitutional claims before the 440 Court, which adjudicated each of those claims on the merits.  *See supra* Section II.E.  Petitioner thus "fairly presented" his theories to the state court and the exhaustion requirement is therefore met.  *See* 28 U.S.C. § 2254(b)(1)(A); *see also Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) ("The exhaustion doctrine is satisfied if the claim has been 'fairly presented' to the state courts.").

## VII.    LEGAL STANDARDS

### A.    The Antiterrorism and Effective Death Penalty Act

This petition is governed by the standard articulated in the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See* 28 U.S.C. § 2254(d).[8]  Under AEDPA, Petitioner must show, as a threshold matter, that the 440 Court's decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  A paradigmatic example of an "unreasonable application" of clearly established Supreme Court law is one in which the court applies the wrong constitutional standard in adjudicating a petitioner's claim.  *See Mask v. McGinnis*, 233 F.3d 132, 140 (2d Cir. 2000) (holding that state court's use of an incorrect legal standard "represents an 'unreasonable application of[ ] clearly established Federal law'" (quoting 28 U.S.C. § 2254(d)(1))).  Even if the state court identifies and applies the correct standard, its decision nevertheless constitutes an unreasonable application

---

[8] Because the 440 Court's order is the "last reasoned opinion" from the state courts on all of Petitioner's claims, it is the relevant state-court decision for purposes of adjudicating this petition.  *See Wilson v. Sellers*, 584 U.S. __, No. 16-6855 (U.S. Apr. 17, 2018); *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000).

of law or unreasonable determination of the facts if no "fairminded jurist" could agree with the state court's decision. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curiam).

Once a petitioner makes this threshold showing, judicial review is "unencumbered" by § 2254(d), *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007), and a federal court may grant the writ if it determines, under a de novo standard of review, that the petitioner's continued custody is "in violation of the Constitution . . . of the United States," 28 U.S.C. § 2254(a); *see also Lewis v. Comm'r of Correction*, 975 F. Supp. 2d 169, 173 (D. Conn. 2013).

### B. Petitioner's constitutional claims

The legal standard for each of Petitioner's three constitutional claims is set forth below.

#### 1. Brady v. Maryland

A successful *Brady* claim requires three showings: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Lewis v. Conn. Comm'r of Correction*, 790 F.3d 109, 123 (2d Cir. 2015) (quoting *Boyette v. Lefevre*, 246 F.3d 76, 89 (2d Cir. 2001)). "Evidence is favorable to the accused if it either tends to show that the accused is not guilty or impeaches a government witness." *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (quoting *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002)) (internal quotation marks omitted). "To establish prejudice, a plaintiff must show that the evidence was material." *Lewis*, 790 F.3d at 124. A *Brady* claim can prevail "even if . . . the undisclosed information may not have affected the jury's verdict." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 & n.6 (2016) (per curiam). Rather, a claimant "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 81 (2012)).

## 2. Napue v. Illinois

Under *Napue v. Illinois*, a conviction obtained through the use of "false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and the "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. 264, 269 (1959). Prior to *Napue*, the Supreme Court made clear that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

The Second Circuit has established a test for *Napue* claims brought under § 2254: "[T]he clearly established Supreme Court precedent relevant to this habeas petition is that the conviction must be set aside if (1) the prosecution actually knew of [the witness's] false testimony, and (2) there is *any reasonable likelihood* that the false testimony could have affected the judgment of the jury." *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) (emphasis added); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) ("[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").

Moreover, prosecutors may be obligated to correct false testimony even when a defendant's counsel has reason to suspect the falsity of the testimony. That constitutional obligation is triggered when "the prosecutor [is] both aware of the falsity of the witness's statements and was 'directly involved as a participant' in the transaction about which the witness was untruthful." *Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 108 (E.D.N.Y. 2003) (quoting *United States v. Helmsley*, 985 F.2d 1202, 1207 (2d Cir. 1993)). Defense counsel's failure to correct the falsity does not defeat a claim for relief under *Napue* in these circumstance because "[s]uch

direct participation by the prosecutor both makes clear the prosecutor's knowledge of the falsity of the statement and leads to a situation in which contradiction of the witness's testimony runs the risk of implicating the credibility of the prosecutor before the jury." *Shih Wei Su v. Filion*, 335 F.3d 119, 128 n.4 (2d Cir. 2003) (internal quotation marks omitted).

### 3. **Strickland v. Washington**

To succeed on a claim of ineffective assistance of counsel, a petitioner must show both that "his counsel provided deficient assistance and that there was prejudice as a result." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). Deficient performance means that "counsel's representation fell below an objective standard of reasonableness." *Id.* (quoting *Strickland*, 466 U.S. at 688). Failure to uncover exculpatory evidence that is readily available constitutes defective performance. *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). The prejudice requirement is met by a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694).

## VIII.  ARGUMENT

### A.  The 440 Court unreasonably applied *Brady* when it found the Bronx DA was not duty bound to disclose the full extent of its efforts to help Morrissey.

The first paragraph of the cooperation agreement states that it "constitutes the entire and exclusive agreement between" Morrissey and the prosecution. (A-112 at ¶ 1). But that is not true. Rather, the evidence showed that ADA Kaplan worked—prior to trial—(1) to relocate Morrissey's wife and (2) to assist Morrissey in his quest for more lenient sentences in jurisdictions other than Kings County, including Queens County. "The *Brady* rule requires prosecutors to disclose *any* benefits that are given to a government informant." *Benn v. Lambert*,

283 F.3d 1040, 1057 (9th Cir. 2002) (emphasis added). Accordingly, Petitioner satisfied all three requirements for a *Brady* claim: the evidence would have been favorable to Petitioner because it would have given the jury additional (and substantial) reason to question the veracity of Morrissey's testimony; the DA did not disclose the evidence to Petitioner before trial; and at least a "reasonable likelihood" exists that this evidence "*could have* affected" the jury's verdict. *Wearry*, 136 S. Ct. at 1006 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)) (emphasis added). But in rejecting Petitioner's claim, the 440 Court applied a more restrictive legal standard that required Petitioner to show that disclosure of this evidence "*would have*" changed the result at trial. Because the 440 Court's decision rests on an unreasonable application of clearly established law, and Petitioner otherwise has met each of the elements of *Brady*, the writ should issue.

1. ***The evidence concerning the Bronx DA's efforts to help Morrissey was favorable to Petitioner.***

ADA Kaplan agreed to try to help relocate Morrissey's wife and child, in direct response to Morrissey's urgent request for that assistance. Kaplan's efforts included making multiple phone calls and sending multiple emails to the CVAU, which itself attempted to help Morrissey's wife find or pay for new housing. At the least, a jury hearing this evidence reasonably could have concluded that ADA Kaplan's efforts provided Morrissey with an inducement to testify for the prosecution, making the evidence valuable for impeachment purposes. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999) ("impeaching character" of evidence renders it favorable); *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) ("While the *Brady* decision itself concerned the failure of the prosecutor to disclose exculpatory evidence, it is clear that the rule announced in *Brady* applies with equal force to the prosecutor's failure to disclose evidence which could have been used for impeachment purposes."). Indeed, where

evidence is "relevant to impeach [a witness's] credibility," there is "no doubt" that it is favorable under *Brady*. *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004) (observing that it is "beyond genuine debate" that evidence that would assist the defense in "attacking [a government witness's] credibility" is favorable under *Brady*).

Nor did ADA Kaplan disclose how important this assistance had been to Morrissey. Morrissey's concern was so great that his attorney emailed Kaplan prior to trial and warned that Morrissey likely would "not testify unless [his wife and child] are moved." (A-004). And although initial efforts to relocate Morrissey's wife in late 2007 proved unsuccessful, efforts on her behalf by the CVAU continued throughout at least January 18, 2008, mere weeks before Morrissey testified at Petitioner's trial. And there was evidence before the 440 Court that Kaplan was kept abreast of those ongoing efforts. Even after the initial claim for assistance was denied in 2007, ADA Kaplan reached out again to see if any assistance could be provided. Kaplan's testimony that he believed there was no "present threat" against Morrissey or his family at the time he provided assistance with CVAU unwittingly makes Petitioner's point. (Ex. 5 at 117). Because Kaplan did not actually fear for anyone's safety, the only rational conclusion is that he acceded to Morrissey's request in order to incentivize Morrissey to testify on the prosecution's behalf: he sought to give Morrissey a sound basis for believing that the Bronx DA's Office was good to its word.

The 440 Court nevertheless found that the evidence of ADA Kaplan's agreement to try to assist relocating Morrissey's wife was not "favorable" because Kaplan did not actually succeed in relocating her. (Ex. 1 at 23). But that finding completely misses the point, and thus represents both an unreasonable determination of the facts and an unreasonable application of *Brady*. The point, of course, is that (1) Morrissey was deeply concerned about his wife and child's safety and

asked the Bronx DA's Office to relocate them, (2) the Bronx DA promptly and repeatedly made efforts to do just that, and (3) the Bronx DA never disclosed either this request from its key witness or the efforts it made to satisfy his pressing concern.

The record shows that the efforts to move Morrissey's wife were ongoing at least through January 2008 and that ADA Kaplan was made aware of those efforts. (A-007). Inexplicably, however, the 440 Court found that Kaplan's efforts came to an unsuccessful conclusion months earlier. (Ex. 1 at 22). But even if this finding had any factual support, the 440 Court unreasonably applied *Brady* when it held that Morrissey's willingness to testify even though his wife could not be relocated demonstrated that the evidence of Kaplan's efforts was not "favorable" to Petitioner.

Indeed, ADA Kaplan's failure actually to obtain relief for Morrissey's wife is of no moment because Kaplan all but expressly promised to try to assist Morrissey's wife, and repeatedly *did attempt* to assist her when Morrissey importuned. *See supra* Section II.C.3.a. Even though its efforts failed, the jury reasonably could have inferred that the DA's willingness to assist Morrissey reassured him that his testimony at Petitioner's trial was greatly valued and would be rewarded. Put differently, ADA Kaplan's pre-trial efforts to help Morrissey's wife may well have convinced Morrissey that Kaplan would go to bat for him when the time came for sentencing in his own cases.

Moreover, contrary to the 440 Court's holding, no "quid pro quo" between Morrissey and ADA Kaplan was required to trigger the prosecution's obligations. (Ex. 1 at 22). Again, the jury reasonably could have concluded that Kaplan's prompt and repeated efforts to satisfy Morrissey's fears for his wife and child's safety made Morrissey "feel part of the state's team and as a result inclined, out of gratitude, friendship, or loyalty, to testify in support of the

prosecution." *Wisehart v. Davis*, 408 F.3d 321, 324 (7th Cir. 2005). In such circumstances,

courts have repeatedly found that evidence of prosecutorial benefits provided to a cooperating

witness is "favorable" evidence that must be disclosed under *Brady*. *See, e.g.*, *United States v.*

*Boyd*, 55 F.3d 239, 243-45 (7th Cir. 1995); *United States v. Williams*, 81 F.3d 1434, 1438 (7th

Cir. 1996); *United States v. Sipe*, 388 F.3d 471, 488-90 (5th Cir. 2004).

As the Ninth Circuit explained, disclosure of prosecutor-provided benefits to a witness-

informant may allow the "jury to reasonably conclude that [the informant] had a motive other

than altruism for testifying on behalf of the State. Such a finding could have substantially

impeached [the informant's] credibility as a witness." *Singh v. Prunty*, 142 F.3d 1157, 1162 (9th

Cir. 1998); *see Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1350 (11th Cir. 2011) (evidence

of a pre-testimony benefit provided to the prosecution's witness "would have provided

substantial and specific evidence of [the witness's] motivation to lie against" the defendant). For

example, in *Drumgold v. Callahan*, the First Circuit held that evidence of a "housing benefit"

provided to the prosecution's "star witness" before trial—including "relocating" that witness—

was favorable under *Brady* because it would "put to the lie to" the witness's claim that he

testified only out of sympathy for the victim's mother. 707 F.3d 28, 35, 40-41, 47 (1st Cir.

2013). In this regard, it bears repeating that Morrissey previously claimed in his letter to the

U.S. Marshal that he "couldn't sit with" Petitioner's alleged confession because Morrissey

sympathized with the victim's children. (A-174, 177).

In *Boyd*, federal prosecutors provided various benefits to certain incarcerated witnesses

prior to their testimony at the defendant's trial. *See* 55 F.3d at 243-45. These benefits included

allowing the witnesses to have physical contact with their visitors—normally barred under the

relevant regulations—and providing the witnesses with unlimited free phone calls. *Id.* The

Seventh Circuit found that evidence of these benefits was favorable to the defendant and had to be disclosed under *Brady* because (1) the benefits revealed a "close relationship between prosecutors and [the witnesses] that had started before the trial," *id.* at 245, and (2) the jury knowing about the favors, "might have wondered whether the witnesses were not receiving implicit assurances of compensation for their testimony going far beyond anything promised in their plea agreements," *id.* at 246. Elaborating on the second point, the court recognized the direct link between a witness's receipt of benefits from the prosecution prior to a defendant's trial and an incentive to testify falsely. After all, if a witness receives special, undisclosed benefits from the prosecution before his testimony, "may it not occur to [the witness] that if he plays ball with his powerful friend the friend will not just get his death sentence reduced to natural life or his natural-life sentence reduced to thirty years but will somehow arrange to restore his freedom to him in the near future?" *Id.* at 246. On this basis, the court affirmed the district court's grant of a new trial.

In *Sipe*, the prosecution before trial had provided its witnesses (aliens living illegally in the United States) with "additional benefits," including Social Security cards and phone expenses, beyond the benefit disclosed to the defendant, which was the right to live and work in the United States. *See* 388 F.3d at 488-89. And the disclosed agreement between the prosecution and the witnesses—like the agreement between ADA Kaplan and Morrissey—stated that "no other benefits were given." *Id.* at 489. The Fifth Circuit held that the undisclosed benefits were favorable and were required to be disclosed under *Brady* because they could have revealed the witnesses' pro-prosecution "bias," or, in other words, "that the aliens' testimony was influenced by their interest in receiving the government benefits." *Id.* at 489-90. The court affirmed the district court's grant of a new trial.

In *Benn*, the prosecution had helped its witness avoid multiple criminal charges prior to his testimony at the defendant's trial. But it failed to disclose its helpful actions to defense counsel. *See* 283 F.3d at 1057. Because this undisclosed information reasonably could have led a jury to "conclude[] that Patrick had a motive other than altruism" for his testimony, the evidence was favorable to the defense. *Id.* The Ninth Circuit thus affirmed the district court's grant of relief under § 2254.

As in those cases, the evidence concerning the undisclosed benefits given to Morrissey was favorable to the defense because the jury reasonably could have concluded that Morrissey had a pro-prosecution bias and an incentive to testify "other than altruism." The 440 Court completely failed to analyze whether the failure to disclose Kaplan's efforts to help Morrissey violated this clearly established application of *Brady*.[9]

Ultimately, whether the evidence of Kaplan's efforts on behalf of Morrissey's wife is "favorable" depends on whether Petitioner could have impeached Morrissey to good effect with that evidence. Clearly, he could have. Had the jury heard this evidence, it could have reasonably concluded that Morrissey had a motive to testify other than his professed altruistic one—that he couldn't "sit with" Petitioner's alleged confession. Instead, the jury could have concluded that Morrissey testified because he hoped that by "playing ball" he would receive other benefits from the Bronx DA, because Morrissey felt indebted to Kaplan for his prior assistance in attempting to help his wife, or because he both so hoped and felt indebted. Thus, the 440 Court misapplied the law and reached an unreasonable view of the facts when it concluded that this evidence was not favorable to Petitioner.

---

[9] Even if a quid pro quo were required (it is not), there was—contrary to the 440 Court's finding—a basis from which a jury reasonably could have inferred a quid pro quo: Morrissey's testimony in exchange for Kaplan's efforts to help Morrissey's wife relocate. *Contra* Ex. 1 at 22 ("There was no quid pro quo to move his family in exchange for his testimony.").

In addition, the evidence that the Bronx DA had made calls to jurisdictions other than Kings County to seek leniency on Morrissey's behalf *prior to* Petitioner's trial was also favorable to Petitioner. The 440 Court correctly acknowledged that the Bronx DA had made at least phone calls to Queens County. (Ex. 1 at 27 ("ADA Kaplan recalled that he called Queens to inquire about [the possibility of Willard] and to inform them of the agreement that Mr. Morrissey had entered into with Kings and Bronx Counties.")). But the court failed to comprehend both the importance of that evidence and why its suppression prejudiced Petitioner. These communications were made in direct response to inquiries from Morrissey's attorney, and thus constituted benefits that would have provided important impeachment value at trial had they been disclosed. The jury could have found that Morrissey had an increased incentive to lie on the stand as a result of ADA Kaplan's efforts on his behalf. This was classic impeachment evidence revealing a motive "other than altruism" for Morrissey's testimony. *See Singh*, 142 F.3d at 1162.

The 440 Court nevertheless found that evidence of these benefits was not "favorable" evidence requiring disclosure under *Brady.* In so finding, the court relied on the fact that in all jurisdictions other than from Kings County the Bronx DA did not "request that a specific sentence be imposed." (Ex. 1 at 27). And the court concluded that any discussions between the Bronx DA and those jurisdictions were merely "logistical in nature," precisely because no specific sentence was requested. (Ex. 1 at 28).

The 440 Court's determination that ADA Kaplan's discussions with other jurisdictions were "logistical" is manifestly unreasonable. Kaplan himself described his discussions with the Queens DA prior to Morrissey's testimony as "substantive," and made clear that those discussions would "continue" in the future (after Morrissey's testimony). (A-118). He also

made clear that he had made the Queens DA "aware of all the Willard stuff." (A-118). Moreover, these discussions came about only because Mr. Trabulus, Morrissey's attorney, asked Kaplan to contact the Queens DA prior to Morrissey's testimony to "*ensure*" that Morrissey "gets Willard there too" because "apparently in Queens, Willard is not certain." (A-116) (emphasis added). Evidence that Kaplan agreed to have and did have—in response to Mr. Trabulus's requests—"substantive" discussions with the Queens DA prior to Morrissey's testimony could have been used to cast doubt on the veracity of Morrissey's testimony.

The 440 Court was thus incorrect to conclude that efforts to seek leniency need not be disclosed if a "specific sentence" is not requested by the prosecution on behalf of an informant. (Ex. 1 at 27). Indeed, even the "*possibility* of a reward" must be disclosed. *United States v. Bagley*, 473 U.S. 667, 683 (1985) (emphasis added). In fact, the promise of a contingent benefit can be *stronger* impeachment evidence than the promise of a benefit that is certain to be obtained. Thus, in *Bagley* the prosecution had promised payments to witnesses if "the information they supplied led to the accomplishment of the objective sought to be obtained . . . to the satisfaction of [the Government]." *Id.* (internal quotation marks omitted). The promise of these possible payments gave the witnesses "a direct, personal stake in respondent's conviction." *Id.* The Court squarely rejected the government's argument that the rewards did not have to be disclosed because they were not *guaranteed*: "The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, *served only to strengthen any incentive to testify falsely in order to secure a conviction.*" *Id.* (emphasis added); *see also Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir. 2011) ("The Supreme Court has suggested that [evidence of prosecutor-provided benefits to a witness] is even more significant if the witness has not received a firm commitment

from the prosecution, because witnesses have greater incentives to lie if the potential benefits are 'not guaranteed through a promise or binding contract.'" (quoting *Bagley*, 473 U.S. at 683)).[10]

As is evident, the 440 Court's reliance on the uncertain nature of the undisclosed sentencing assistance is contrary to clearly established Supreme Court law. Because a jury could find that ADA Kaplan's pre-trial efforts were indeed valuable to Morrissey, and thus could have given Morrissey an incentive to testify falsely and favorably to the prosecution, evidence of those efforts was "favorable" and thus had to be disclosed under *Brady*.

## 2.    *The evidence was not disclosed.*

The jury never heard about Kaplan's myriad efforts to assist Morrissey prior to Petitioner's trial because the prosecution never disclosed that favorable evidence to Petitioner.

In the 440 Court, the Bronx DA did not deny Petitioner's allegation that the full extent of Kaplan's efforts to assist Morrissey was not disclosed, or contend that Petitioner could have uncovered the evidence himself. Nevertheless, the 440 Court found that Kaplan's efforts to seek leniency for Morrissey were adequately disclosed by Paragraph 12 of the written cooperation agreement. (Ex. 1 at 28; A-114 at ¶ 12). That was an unreasonable determination of the facts. Paragraph 12, which requires the Bronx DA to report Morrissey's truthful testimony to other jurisdictions *after* the testimony takes place, clearly does not contemplate or require *pre-trial* efforts by the Bronx DA to assist Morrissey at all, including any communications with district attorneys in other counties. And it also does not—indeed, could not—excuse any *Brady* violations committed by the Bronx DA by failing to disclose any pre-testimony discussions with other jurisdictions. And it discloses nothing whatsoever about the prosecution's repeated efforts

---

[10] Similarly, the Second Circuit held in *Dubose v. Lefevre* that a prosecutor's statements to a witness that she would "do the right thing" and that leniency would be "in the realm of possibility" must be disclosed. 619 F.2d 973, 978 (2d Cir. 1980) (reversing denial of habeas claim brought under *Brady*).

to relocate Morrissey's wife and thus satisfy an important concern of its key witness. Without question, the full extent of the benefits received by Morrissey was not disclosed.

### 3. *The evidence is material and Petitioner was prejudiced by its non-disclosure.*

Petitioner suffered prejudice as a result of the Bronx DA's suppression of the favorable evidence before trial. "To establish prejudice, a plaintiff must show that the evidence was material." *Lewis*, 790 F.3dbag at 124. Petitioner made such a showing to the 440 Court, but the court denied the claim based on its application of an incorrect legal standard. Because the 440 Court's decision is premised on an unreasonable application of clearly established Supreme Court law, it is not entitled to AEDPA deference. *See Mask*, 233 F.3d at 140.

#### a.     The non-disclosed evidence was material.

As stated above, evidence is material where its nondisclosure "undermines confidence" in the jury's verdict. *Wearry*, 136 S. Ct. at 1006 & n.6. Courts have "not been reluctant to grant habeas corpus relief where material evidence impeaching key prosecution witnesses was suppressed." *Hill v. Mitchell*, 2012 WL 995280, at *5 (S.D. Ohio Mar. 23, 2012); *Wilson*, 589 F.3d at 665 (holding that evidence of a witness's "pro prosecution" bias is material under *Brady*). For example, in *Lewis*, an informant provided the only direct evidence of the defendant's guilt, but evidence that the informant had been supplied information by a police officer was not disclosed. 790 F.3d at 124. The evidence showed that the informant had then merely "parroted" this information when he testified favorably for the prosecution. Affirming the grant of habeas relief under § 2254, the Second Circuit noted that "[a]t trial, no witness other than Ruiz directly implicated Lewis in the murders . . . . As a result, Ruiz's testimony was critical to the State's obtaining a conviction." *Id.*; *see also Simmons v. Beard*, 590 F.3d 223, 236 (3d Cir. 2009) ("The

prosecution's case rested in no small part on Cobaugh's credibility, and thus evidence relevant to her motives for testifying cannot be so easily dismissed as immaterial.").  The same is true here.

b.  The 440 Court applied the wrong Brady standard, obviating the need for AEDPA deference.

In reaching its conclusion that the undisclosed evidence was not material, the 440 Court articulated, and applied, the wrong legal standard.  Thus, the 440 Court stated that to show materiality under *Brady*, Petitioner needed to prove that "the result of the proceeding *would have been different*" had the evidence been disclosed.  (Ex. 1 at 18) (emphasis added).  On the next page of its order, the 440 Court reiterated its erroneous belief that Petitioner was required to meet this exacting standard, which required *certainty*: "[evidence] cannot be said to have been material, unless the outcome of the trial *would have been different* had the information been disclosed."  (Ex. 1 at 19).

But, of course, as the Supreme Court stated anew nearly a year prior to the 440 Court's order, a *Brady* claimant can prevail "even if . . . the undisclosed information *may not have affected the jury's verdict*" at all.  *Wearry*, 136 S. Ct. at 1006 & n.6 (emphasis added).  Instead, the claimant "must show *only* that the new evidence is sufficient to '*undermine confidence*' in the verdict." *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 81 (2012)) (emphasis added).  Put another way, Petitioner must show only a likelihood that the evidence "*could* have affected" the verdict, not that the verdict *would* have been different.  *Id.* (emphasis added).  The "undermine confidence" standard was articulated as far back as 1995, *see Kyles v. Whitley*, 514 U.S. 419, 435 (1995), and was reiterated by the Supreme Court in *Smith* in 2012 and *Wearry* in 2016.  Indeed, Petitioner's post-conviction counsel cited repeatedly both the "undermines confidence" (S-243, S-637) and "could have affected" language (S-693 (citing *Wearry*, 136 S. Ct. at 1006)) to the 440 Court.  And the 440 Court's "insistence on certainty"—placing on Petitioner the burden of

proving a *different outcome* of his trial, as opposed to merely undermining confidence in that

outcome—"represents an unreasonable application of clearly established" Supreme Court law.

*Mask*, 233 F.3d at 140 (holding that the state court had applied incorrect rule in the ineffective

assistance of counsel context when it asked for "certainty," and affirming use of de novo

standard of review).

Accordingly, this Court should not give deference under AEDPA to the 440 Court's

findings and should analyze the prejudice prong of Petitioner's *Brady* claim under a *de novo*

standard of review.

The 440 Court's misunderstanding of the correct legal standard led it to misapply the law

repeatedly in finding the undisclosed evidence to be immaterial in at least two ways.

First, the court misapplied the law and failed to recognize that the evidence was material,

in part, because it was not merely "cumulative" of other impeachment evidence.  *Cf. Shabazz v.

Artuz*, 336 F.3d 154, 167 (2d Cir. 2003).  ADA Kaplan's agreement to help relocate Morrissey's

wife is of a different nature altogether than the other impeachment evidence available to

Petitioner, including Morrissey's written cooperation agreement.  And a core teaching of *Brady*

is that if withheld evidence is of a "different kind" than disclosed evidence, then the evidence is

more likely to be material.  *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005) ("[T]he

undisclosed evidence was not duplicative of the impeachment evidence actually presented, but

rather was of a different kind."); *see also Lambert v. Beard*, 537 F. App'x 78, 83 (3d Cir. 2013)

(it is "patently unreasonable" for a state court to "presume—without explanation—that whenever

a witness is impeached in one manner, any other impeachment becomes immaterial," especially

when undisclosed evidence would have "opened an entirely new line of impeachment"); *Burt v.

Aleman*, 2008 WL 1927371, at *8 (E.D.N.Y. Apr. 30, 2008).  In situations like that, the evidence

could have "provided the defense with a new and different ground of impeachment." *Silva*, 416 F.3d at 989 (quoting *Benn*, 283 F.3d at 1056).

That was precisely the case here. The jury never heard either of Morrissey's strong concern for the safety and wellbeing of his wife and child, or of the Bronx DA's efforts to satisfy that concern. Thus, contrary to the 440 Court's minimization of the evidence, the jury could have drawn important conclusions beyond merely that "a letter was written" by ADA Kaplan. (Ex. 1 at 24). At the very least, the failure to disclose the evidence undermines confidence in the jury's verdict. Morrissey clearly feared for his wife's safety, and the ADA Kaplan responded to that fear by providing Morrissey with a benefit—efforts to secure relocation—which ultimately was not disclosed. Morrissey could have felt indebted to the prosecution for its efforts, cementing his willingness to falsely incriminate Petitioner. Or Morrissey could have seen the efforts as a strong sign of the prosecution's good faith, or its willingness to go above and beyond any written agreement to help him, which also could have further cemented his willingness to testify falsely. Each of these conclusions would have offered valuable impeachment testimony. But the 440 Court simply failed to recognize this well-established application of *Brady* in nevertheless finding the undisclosed evidence to cumulative and immaterial.

Indeed, several courts have recognized that "the state cannot satisfy its *Brady* obligation to disclose exculpatory and impeachment evidence 'by making some evidence available and asserting that the rest would be cumulative. Rather, the state is obligated to disclose all material information casting a shadow on a government witness's credibility.'" *Benn*, 283 F.3d at 1057-58 (quoting *Carriger v. Stewart*, 132 F.3d 463, 481-82 (9th Cir. 1997)). Indeed, even where the prosecution's actions "resulted in minimal benefit to the informant," those actions "cast a shadow on [the informant's] credibility" and their suppression is material under *Brady*. *Maxwell*

*v. Roe*, 628 F.3d 486, 510 (9th Cir. 2010) (quoting *Benn*, 283 F.3d at 1057-58); see also *LaCaze v. Warden Louisiana Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011) ("The materiality inquiry does not turn on which of two competing sources of bias a court, in hindsight, determines the jury would have considered more important.  Rather, the inquiry is whether an undisclosed source of bias—even if it is not the only source or even the 'main source'—could reasonably be taken to put the whole case in a different light.").

For example, in the *Sipe* case discussed above, the defendant possessed some evidence of the prosecution's witnesses' bias, including certain benefits provided by the prosecution to those witnesses.  But the failure to disclose *additional* benefits provided to the witnesses was nonetheless held material under *Brady* because (1) the prosecution had affirmatively misrepresented that the witnesses had received no additional benefits, and (2) the undisclosed testimony "change[d] the tenor of the aliens' testimony, [and] place[d] their 'cooperation' with the government in context."  *Id.* at 489.  The same is true here because, as noted, the disclosed cooperation agreement falsely represented that it reflected the "entire" and "exclusive" agreement between Morrissey and the prosecution.

In addition, in *Burt*, the court rejected the government's argument that a witness's "doubts about her identification of Plaintiff" were duplicative of impeachment evidence—such as the existence of a cooperation agreement—already presented at the trial and thus not material.  *Burt*, 2008 WL 1927371, at *8.  Instead, the court held that the witness's doubts about her identification of the defendant went "to the heart of the State's case" because they addressed "the reliability of [the witness's] identification of Plaintiff as the shooter."  *Id.*  And because evidence of those doubts "would have been significantly stronger proof of the lack of reliability" of the witness's identification than other evidence presented, the evidence was material.  *Id.*

43

For the reasons stated above, the suppressed evidence here, as in *Sipe* and *Burt*, was powerful impeachment evidence. And the prosecution affirmatively misrepresented that its written agreement with Morrissey was the sole and exclusive source of any benefits it would provide for him. (A-112 at ¶ 1). Thus, contrary to the 440 Court's finding, the mere fact that the jury heard other evidence that diminished Morrissey's reliability does not automatically render the undisclosed evidence immaterial.

The evidence concerning Kaplan's pre-trial calls to Queens County on Morrissey's behalf was not cumulative either. It would have revealed to the jury the sentencing-related benefits Morrissey had received prior to his testimony, and would have shown what he hoped from the outset to gain: *Willard* sentences for each of his New York convictions, despite his abysmal criminal history. Without this evidence, the jury could have reasonably thought that Morrissey stood to gain a *Willard* sentence only with respect to his Kings County conviction. The truth was far more encouraging for Morrissey: unbeknownst to the jury, Morrissey stood to gain *Willard* sentences for *all* of his New York felony convictions. And that benefit was ultimately achieved through his attorney's diligent requests to ADA Kaplan, who promptly acted upon those requests, including prior to trial. None of this was disclosed to defense counsel, and thus a crucial impeachment opportunity was lost.

Second, the 440 Court also misapplied the law when it unreasonably concluded that the evidence concerning ADA Kaplan's efforts to help Morrissey's wife relocate was unimportant: "The jury would have learned only that a letter was written seeking relocation for Morrissey's wife but that the request was denied . . . ." (Ex. 1 at 24). This downplays significantly (and unreasonably) the materiality of the evidence. As discussed, Kaplan did more than just "write a letter," and the efforts to assist Morrissey's wife continued through at least mid-January 2008,

only a few weeks before Petitioner's trial. Indeed, Kaplan's efforts were entirely in response to Mr. Trabulus's warning that Morrissey *would not testify* unless those efforts were made. As a result, Kaplan's efforts, for the reasons discussed above, reasonably could have been seen by a jury to have incentivized Morrissey to testify on the prosecution's behalf.

Given all this, there is at least a reasonable likelihood that the jury could have come to a different conclusion had it heard evidence of Kaplan's efforts to relocate Morrissey's wife. This claim satisfies all elements of a successful *Brady* claim, and the 440 Court's contrary conclusion is an unreasonable application of clearly established Supreme Court law.

## B. The prosecution's failure to correct the false testimony it elicited from Morrissey violated Petitioner's constitutional rights under *Napue*.

Under established Supreme Court precedent, ADA Kaplan should have corrected Morrissey's false testimony that his New Jersey conviction had no connection "whatsoever" to his testimony in Petitioner's trial. The *only* reasonable conclusion available to the jury was that Morrissey's testimony would not lead to *any* actions by Kaplan with respect to his New Jersey case and could not have any beneficial effect on the outcome of that case.

But, of course, that was not true. As ADA Kaplan knew, the written agreement between Morrissey and Bronx/Kings Counties stipulated that Kaplan would "report the nature and extent of Kevin Morrissey's cooperation to other law enforcement or judicial authorities as requested." (A-113 at ¶ 12). The 440 Court correctly interpreted this language to *require* ADA Kaplan to inform New Jersey about Morrissey's cooperation. (Ex. 1 at 28). Thus, ADA Kaplan knew at that Morrissey's testimony at the trial would lead—at the very *least*—to him putting in a good word for Morrissey with the Bergen County prosecutor. Moreover, the evidence before the 440 Court showed that Kaplan had communicated with the Bergen County prosecutors before Petitioner's trial to verify the existence of Morrissey's charges. (Ex. 5 at 57). Yet Kaplan

allowed Morrissey to testify that there would be no connection—"none whatsoever"—between his testimony and his New Jersey case. This was not true, and Kaplan was required to inform the trial court and the jury that Morrissey had not spoken the truth.

As noted, a prosecutor has an obligation to correct false testimony, and that obligation can extend to circumstances where a defendant's counsel is aware of the falsity. *See supra* Section VII.B.2. When a prosecutor fails to do so, and "there is *any reasonable likelihood* that the false testimony *could have* affected the judgment of the jury," the conviction cannot stand. *Drake*, 553 F.3d at 241 (emphasis added).[11]

For example, in *Shih Wei Su*, the defendant's lawyer had "some information that a deal *might* have been made" between the prosecution's witness and the prosecution. 335 F.3d at 128 (emphasis in original). But the prosecution's false denials of such a cooperation agreement, and the witness's testimony on direct examination that no such deal existed, made it impossible for defense counsel to reveal the truth without "assum[ing] that the prosecutor had lied." *Id.* And the court noted that, generally, a defendant is not required to "run[] the risk of implicating the credibility of the prosecutor before the jury." *Id.* at 128 n.4. As a result, the Second Circuit concluded that defense counsel's failure to cross-examine the witness regarding the existence of a deal did not bar relief under § 2254.

This case is much like *Shih Wei Su*. Although the relationship between Petitioner's testimony and his New Jersey case was arguably evident to Petitioner's trial counsel by the written cooperation agreement, trial counsel's awareness of this fact is not dispositive. Rather,

---

[11] Notwithstanding that relevant case law was cited in Petitioner's briefs to the 440 Court, (S-607, 652, 695), the 440 Court's discussion of this claim failed to cite even one case. (Ex. 1 at 31-32). The court's decision gives no reason to think that it applied to Petitioner's *Napue* claim a different standard than the incorrect standard it applied to Petitioner's *Brady* claim. That incorrect standard, which required that Petitioner prove certainty, does not properly apply to *Napue* claims either.

because Kaplan was "directly involved as a participant in the transaction about which the witness has allegedly lied," and at least some aspects of the relationship between Morrissey's testimony and his New Jersey case were not disclosed, the prosecution was not relieved of its duty under *Napue. See Shih Wei Su*, 335 F.3d at 128 n.4. Indeed, Kaplan had participated directly in the negotiation and signing of the agreement with Morrissey, and understood better than anyone that he would be required to call the Bergen County prosecutors once Petitioner's trial ended. Nevertheless, ADA Kaplan intentionally elicited, on re-direct examination, testimony he knew to be false.

Thus, to ferret out the truth at trial, Petitioner's counsel would have been forced to insinuate on re-cross examination that Kaplan had elicited false testimony and "run[] the risk of implicating the credibility of the prosecutor before the jury." *Id.* at 128 & n.4. "And it seems hardly reasonable to require a defendant to risk opening the door to adverse testimony . . . on the chance that the prosecutor had . . . knowingly elicited false testimony denying that an agreement had been made." *Id.* As a result, defense counsel's imperfect knowledge of any agreement between ADA Kaplan and Morrissey with respect to Morrissey's New Jersey case cannot excuse the constitutional violation that occurred when Kaplan failed to correct Morrissey's false testimony.

The 440 Court nevertheless illogically concluded that Kaplan had not violated *Napue* because Morrissey and Kaplan did not know, at the time of the trial, the precise sentence Morrissey faced in New Jersey. (Ex. 1 at 31). But that circumstance does not alter the falsity of Morrissey's statement. He knew there was a connection between his testimony and New Jersey because (1) he knew that ADA Kaplan would be obligated to speak with the Bergen County prosecutor if he was satisfied with the truth of Morrissey's testimony, (2) he at least had reason

to believe that Kaplan's intercession would benefit him in the Bergen County case, and (3) he certainly hoped that it would.  Had the jury known that Morrissey expected to receive some *additional* assistance from the Bronx DA in New Jersey as a result of his testimony, its verdict may very well have been different.  Instead, the jury heard only the manifestly false "none whatsoever" testimony.  Thus, there is at least a "reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Drake*, 553 F.3d at 241.

The writ should issue on this basis.

**C.**      **Petitioner's trial counsel was ineffective for failing to uncover Morrissey's history of mental illness.**

Petitioner's trial counsel was ineffective for failing to uncover evidence of Morrissey's history of mental illness.  This devastating impeachment evidence, which showed that Morrissey had been diagnosed with and prescribed medication for psychological disorders that affect the ability to distinguish reality from fiction, could only have greatly diminished Morrissey's credibility in the eyes of the jury.  Nonetheless, the 440 Court rejected this claim based on a finding that Morrissey's mental health history, merely because it included one diagnosis as a "malingerer," somehow completely neutralized the effect of Morrissey's long history of severe mental illness.  (Ex. 1 at 33-36).  The 440 Court's decision is plainly an unreasonable determination of fact that led to an unreasonable application of *Strickland* with which no reasonable jurist could agree.  Because the 440 Court's decision is not entitled to AEDPA deference, and because Petitioner has satisfied the elements of *Strickland*, the writ should issue on the basis of ineffective assistance of trial counsel.

### 1. Petitioner's trial counsel was deficient for failing to uncover Morrissey's mental health history.

"The duty to investigate is essential to the adversarial testing process '[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies.'" *Greiner v. Wells*, 417 F.3d 305, 320 (2d Cir. 2005) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)). While defense counsel need not "scour the globe on the off-chance something will turn up," there is some duty to investigate "vitally important" defenses. *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005); *see Green v. Lee*, 964 F. Supp. 2d 237, 256–57 (E.D.N.Y. 2013) ("[D]espite the vital importance of these factual determinations, his trial counsel failed to make a reasonable investigation."). When evidence is readily available, moreover, that makes it more likely that counsel was deficient in failing to uncover it. For example, the Supreme Court found in favor of a habeas petitioner asserting ineffective assistance when the crucial file was "sitting in the trial courthouse, open for the asking," yet counsel failed to find it. *Rompilla*, 545 U.S. at 389. That failure is not the kind of strategic or legitimate choice immune from scrutiny in an ineffective assistance of counsel review; rather, it is a quintessential deficiency entitling a petitioner to relief. *Id.*

The 440 Court found that, as in *Rompilla*, the crucial mental health evidence here was easily accessible by Petitioner's trial counsel once he was given Morrissey's criminal history by the Bronx DA in advance of trial. Specifically, the court noted that the evidence "was contained in court files" that were a "matter of public record." (Ex. 1 at 15). In addition, the court found that defense counsel "had an opportunity to become aware of [Morrissey's] possible mental illness" from sources trial counsel "clearly knew about." (Ex. 1 at 15). The court concluded that with "due diligence," counsel could have discovered the evidence. (Ex. 1 at 16). And given the

importance of Morrissey's testimony, looking into Morrissey's criminal history would have been a top priority of any competent counsel.  To be sure, Petitioner's counsel did not have reason to believe that the court files also would reveal that Morrissey had been diagnosed with, and prescribed medication for, schizophrenia, a condition that undermines a sufferer's ability to distinguish reality from fiction; that he suffered psychosis, and believed a different person lived inside of him; and that numerous judges had directed that his competency be evaluated.  *See supra* Section II.C.1.  But that is beside the point, which is that competent counsel would look into the court records of a key government witness in a murder case.  Had Petitioner's counsel done so here, he would have been armed with evidence exceptionally damaging to Morrissey's credibility.

The Third Circuit's decision in *Wilson* is similar.  There, the state had failed to turn over the criminal history for one of the prosecution's witnesses—Jackson—and a hospital visit for another prosecution witness—Rahming.  Although the case involved *Brady* claims, the court clarified that *Brady* assumes the existence of "competent counsel."  *Id.* at 664 (quoting *Kyles*, 514 U.S. at 441).  And if competent counsel knew about the suppressed evidence, counsel would have uncovered damning impeachment evidence, which included mental health evaluations.  Thus, the court rejected the government's argument that it was "speculative" whether "defense counsel would have uncovered" the evidence.  *Id.*  Rather, the court held that

> We have no trouble concluding that competent trial counsel would have requested the . . . mental health evaluation prepared in connection with Jackson's conviction . . . , and that, had competent trial counsel been made aware of Rahming's post-testimony hospital visit, he would have sought out additional information regarding Rahming's mental health history. We also have no doubt that . . . competent trial counsel, having done so, would have used all of this information to impeach the Commonwealth's witnesses.

*Wilson*, 589 F.3d at 665.  As in *Wilson*, there should be no question that Petitioner's trial counsel, acting competently, should have uncovered the mental health evidence by performing the elementary task of looking into the court files.

The 440 Court's conclusion that trial counsel's performance was nevertheless sufficient was based on an unreasonable determination of the facts.  In particular, the 440 Court completely failed to understand the impeachment value of the evidence.  Its opinion focused largely, if not exclusively, on Morrissey's diagnosis as a "malingerer," rather than his diagnoses of psychosis, psychotic disorder, schizophrenia, addiction, depression, memory problems, confusion, auditory hallucinations, and cocaine addiction.  (S-181, S-191 to S-192, S-194, S-203 to S-204, S-212).  As a result, the court held, incredibly, that all the evidence of Morrissey's extensive, documented history of pervasive mental illnesses showed merely that "Morrissey was not psychotic, or delusional but a manipulator."  (Ex. 1 at 17).  The court took a single diagnosis, "malingerer," and used it to flip the rest of the evidence on its head.  Even if the court's conclusion was reasonable—and it surely was not—it is enough that *the jury* reasonably could have come to a very different conclusion.

In no event could a reasonable jurist agree that a jury could conclude *only* that Morrissey was "not psychotic" based on the evidence.  And that unreasonable determination tainted the rest of the 440 Court's analysis.  First, based on its determination that the evidence of Morrissey's psychosis somehow proved that he was *not* psychotic, the 440 Court illogically concluded that Petitioner had failed to show "the absence of strategic or other legitimate explanations" for counsel's failure to uncover Morrissey's mental health history prior to trial.  (Ex. 1 at 35).  But again, this misses the point, which is that there is no conceivable strategic or other legitimate explanation for counsel's failure to look into the readily available court files.  And counsel's

other actions, such as delivering opening and closing statements, and cross examining witnesses (including a perfunctory cross-examination of Morrissey), hardly excuse his failure to undertake the basic, necessary, and crucial investigative step of looking into Morrissey's criminal history. *See Rompilla*, 545 U.S. at 379 (finding ineffective assistance of counsel despite counsel's "efforts to uncover mitigation material, which included interviewing Rompilla and certain family members, as well as consultation with three mental health experts").

Accordingly, Petitioner's counsel's performance was deficient, and the 440 Court's contrary conclusion was an unreasonable application of *Strickland*.

### 2. *Trial counsel's ineffectiveness greatly prejudiced Petitioner.*

Trial counsel's inexcusable failure greatly prejudiced Petitioner. While the other information available to the jurors may well have given them cause to think that Morrissey had an *incentive* to lie on the stand, nothing presented could have—even remotely—led the jury to conclude that Morrissey had a documented history of profound mental health problems. "Courts have long recognized the impeachment value of evidence that a government witness has a 'severe illness, such as schizophrenia, that dramatically impaired [his] ability to perceive and tell the truth.'" *Gonzalez v. Wong*, 667 F.3d 965, 983 (9th Cir. 2011) (quoting *United States v. Butt*, 955 F.2d 77, 82–83 (1st Cir. 1992)).[12]

---

[12] *See also Butt*, 955 F.2d at 77, 82-83 ("For over forty years, federal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to."); *Wilson*, 589 F.3d at 666 (mental health evidence can be used to show a witness's "impaired 'ability to perceive, remember and narrate perceptions accurately,' which is clearly relevant to his credibility as a witness" (quoting *Cohen v. Albert Einstein Med. Ctr.*, 592 A.2d 720, 726 (1991))); *East v. Johnson*, 123 F.3d 235, 236-40 & n.1 (5th Cir. 1997) ("East's *Brady* claim alleged that the prosecution failed to disclose the criminal record of Barbara Hardaway, one of the state's sentencing-phase witnesses, and that production of Hardaway's criminal record would have led East to discover her mental history and allow East to impeach her testimony."); *cf. Benn*, 283 F.3d at 1056 (*Brady* required that evidence of a witness's drug use be revealed to defense because it was relevant to impeach the witness's

The Second Circuit has also noted that "[s]ome psychiatric history evidence unquestionably will be . . . material to witness or victim credibility." *Fuentes v. T. Griffin*, 829 F.3d 233, 257 (2d Cir. 2016). As examples, the court cited decisions discussing illnesses with a high "severity of diagnosis" and a "nexus between the nature of the disorder and its effect on the particular witness's credibility," such as "schizophrenia." *Id.* (citing *Gonzalez*, 667 F.3d at 982-84). Morrissey's schizophrenia diagnosis presents the same nexus. Evidence that Morrissey was a diagnosed schizophrenic, had previously been prescribed psychotropic drugs, and had previously stated that another being lived inside of his body would have offered significant impeachment value. As Petitioner's post-conviction counsel noted to the 440 Court (S-236), the National Institute of Mental Health states that the effects of schizophrenia include "losing touch with reality and suffering from delusions and hallucinations." In addition, "a schizophrenic may have difficulty distinguishing fact from fantasy and may have his memory distorted by delusions, hallucinations, and paranoid thinking." (S-236).

The 440 Court only once mentioned Morrissey's schizophrenia diagnosis, and failed to conduct any meaningful analysis as to the diagnosis's impeachment value. Instead, as noted, it came to the untenable conclusion that because Morrissey had been diagnosed as a "faker and malingerer," his other diagnoses were irrelevant and he was "not psychotic . . . but a manipulator." (Ex. 1 at 17).

In addition, much like the suppressed information regarding the assistance provided to Morrissey's wife, the information regarding Morrissey's history of mental health issues would

---

"ability to recollect or perceive the events"); *United States v. Lindstrom*, 698 F.2d 1154, 1160-61 (11th Cir. 1983) (describing how mental health history can be used for impeachment, and noting that "[a] paranoid schizophrenic, though he may appear normal and his judgment on matters outside his delusional system may remain intact, may harbor delusions of grandeur or persecution that grossly distort his reaction to events").

have "provided the defense with a new and different ground of impeachment." *Silva*, 416 F.3d at 989 (quoting *Benn*, 283 F.3d at 1056). The jury heard *no* information of this sort whatsoever.

Because the 440 Court failed to comprehend the vast amount of such evidence, the ease with which it could have been discovered, trial counsel's duty to undertake a basic investigative step, and the significant impeachment value of the evidence, its decision was an unreasonable application of *Strickland*, and the writ should issue on this basis.

## IX.   <u>CONCLUSION</u>

Petitioner's conviction is tainted beyond repair by the failings of the Bronx County DA's office and Petitioner's trial counsel. Given Morrissey's history of mental illness—including schizophrenia and psychosis—his lengthy rap sheet, and his role as a repeat jailhouse informant, it is questionable whether Morrissey should have ever been put forward as a witness for the government in the first place.[13]   But assuming it was appropriate to use Morrissey as a witness, the Bronx DA should have applied the strictest rigor in disclosing completely the inducements it offered Morrissey, and in correcting his false testimony at trial. It did not. Defense counsel compounded the prejudice to Petitioner by failing to uncover evidence concerning Morrissey's mental health that would have cast significant doubt on his testimony. Each of these failures undermines confidence in the jury verdict, and the 440 Court's contrary conclusions arise from unreasonable determinations of the facts, as well as unreasonable applications of clearly established Supreme Court law.

---

[13] In 2013, after Petitioner's trial, the federal government attempted to use Morrissey as an informant in a case in the Southern District of New York. As Petitioner pointed out to the state post-conviction court (S-333), Judge Buchwald noted there that Morrissey had "the longest rap sheet" she had seen in her 34 years on the bench, and wondered aloud why the federal government had not investigated him and "learn[ed] everything about" his history before using him as a witness. *United States v. Ortiz*, 12-cr-336 (S.D.N.Y.), (Dkt. 27 at 12). The federal government ultimately decided not to use Morrissey's testimony.

Petitioner respectfully submits that a writ of habeas corpus should be issued under 28

U.S.C. § 2254, and that he should be released unless the state retries him within sixty days. *See*

*Shih Wei Su*, 335 F.3d at 130.

Dated: June 27, 2018

By: _____
Evan H. Stein (ES-2139)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
(646) 837-5151
estein@hsgllp.com


Christina Swarns
Anastasia B. Heeger (AH-9640)
OFFICE OF THE APPELLATE DEFENDER
11 Park Place, Suite 1601
New York, NY 10007
(212) 402-4100

*Attorneys for Petitioner*