# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FELIPE ARROYO, confined as Wende Correctional
Facility, Prisoner No. 08A3133,

                              Petitioner,

          v.

STEWART ECKERT,
SUPERINTENDENT, WENDE
CORRECTIONAL FACILITY,

                              Respondent.

Case No. 18-cv-_____

**PETITION FOR WRIT OF
HABEAS CORPUS PURSUANT
TO 28 U.S.C. § 2254**

 

This petition is in the form dictated by the model form for use in petitions for habeas corpus pursuant to 28 U.S.C. § 2254 in the Southern District of New York.  Please see the attached <u>Memorandum of Law in Support of the Petition</u> for detailed explanations of each of Petitioner's claims.

Paragraphs one through twelve state the history of the state court proceedings; paragraph thirteen lists the exhibits; paragraphs fourteen through forty-two state the federal constitutional claims; paragraphs forty-three through forty-eight contain required technical information.

<u>PROCEDURAL HISTORY</u>

1.      Petitioner was convicted in the Supreme Court of the State of New York, Bronx County Criminal Term, under Indictment 4502/2006.

2.      Judgment of conviction was entered and sentencing occurred on April 1, 2008.

3.      Petitioner was sentenced to a prison term of 25 years to life. Petitioner is confined at Wende Correctional Facility, 3040 Wende Road, Alden, New York, 14004-1187, under the legal

custody of the respondent, Stewart Eckert, who is the Superintendent of Wende Correctional

Facility. Petitioner's prison number is 08A3133.

4.      Petitioner was convicted of one crime.

5.      Petitioner was convicted of murder in the second degree, N.Y. Penal Law § 125.25.

6.      Petitioner pleaded not guilty, and the case was tried before a jury.

7.      Petitioner did not testify at trial.

8.      Petitioner appealed his conviction.

9.      Petitioner appealed to the Supreme Court of New York, Appellate Division, First

Department.  Petitioner's conviction was affirmed on October 13, 2011. *People v. Arroyo*, 88

A.D.3d 495, (1st Dep't 2011). Petitioner raised six grounds in his direct appeal: (1) suppression

of evidence under *Miranda v. Arizona*; (2) evidence of prior bad acts should not have been

admitted; (3) the admission of crime scene photos prejudiced the defendant; (4) the jailhouse

informant should have been treated as an agent of the state; (5) the trial court's alibi instruction

was erroneous; and (6) the trial court's jury instruction on intent was erroneous.  Petitioner

sought leave to appeal his conviction to the New York Court of Appeals, which denied on March

6, 2012. *People v. Arroyo*, 18 N.Y.3d 955 (2012).  Petitioner raised three grounds in his leave

application: (1) prior bad act evidence should not have been introduced; (2) suppression of

evidence under *Miranda*; and (3) the crime scene photos should not have been admitted.

Petitioner did not file a petition for certiorari in the United States Supreme Court.

10.     Petitioner has filed in state court previous petitions, applications, or motions concerning

his judgment of conviction.

11.     On April 27, 2010, Petitioner filed a motion to vacate the judgment of conviction,

pursuant to New York Criminal Procedure Law § 440.10.  Petitioner's motion raised seven

grounds: (1) newly discovered evidence of the informant's psychiatric history casts doubts on his testimony; (2) trial counsel was ineffective under the federal Constitution and state law for failing to uncover that history; (3) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose that history; (4) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose a benefit provided in exchange for the informant's testimony; (5) the prosecution violated the defendant's constitutional rights under *Napue v. Illinois* and related state law when it failed to correct the informant's false testimony; (6) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose the informant's prior instances of being an informant; (7) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose the full extent of its assistance to the informant in exchange for his testimony. After an evidentiary hearing, the motion was denied by an order of the Supreme Court, Bronx County (Carter, J.S.C.), dated January 13, 2017.

On March 20, 2017, Petitioner sought leave to appeal the denial of his motion to the Supreme Court, Appellate Division, First Department. Motion No. M-1407. Petitioner's leave application raised the same seven grounds that were raised before, and rejected by, the Supreme Court, Bronx County: (1) newly discovered evidence of the informant's psychiatric history casts doubts on his testimony; (2) trial counsel was ineffective under the federal Constitution and state law for failing to uncover that history; (3) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose that history; (4) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose a benefit provided in exchange for the informant's testimony; (5) the prosecution violated the defendant's constitutional rights under *Napue v. Illinois* and related state law when it failed to correct the informant's false testimony; (6) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose the

informant's prior instances of being an informant; (7) the prosecution violated *Brady v. Maryland* and related state law by failing to disclose the full extent of its assistance to the informant in exchange for his testimony.  Leave to appeal was denied on June 29, 2017.

12.     Petitioner has filed no other proceedings in state or federal court challenging his judgment of conviction and sentence.

<u>CITATIONS TO PETITIONER'S EXHIBITS</u>

13.     Undersigned counsel is filing, contemporaneously with filing this Petition for a Writ of Habeas Corpus, transcripts and exhibits containing relevant documents from the record in the State trial and appellate courts.

EXHIBIT 1:   The Decision and Order determining Petitioner's State Court Post-Conviction Proceedings under CPL 440 (the "440 Proceedings").

EXHIBIT 2:    Submissions and Decisions in the 440 Proceedings (pagination beginning with "S-")

EXHIBIT 3:   Arroyo Exhibits and Material Related to 440 Proceedings (pagination beginning with "A-")

EXHIBIT 4:    Transcripts Related to 440.10 Proceedings (pagination beginning with "T-")

EXHIBIT 5:   Trial Transcript, *People v. Arroyo*

EXHIBIT 6:   Hearing Transcript in 440 Proceedings, *People v. Arroyo*

<u>GROUNDS OF UNCONSTIUTIONALITY OF PETITIONER'S CONVICTION AND SENTENCE</u>

14.     Petitioner raises three grounds in this Petition under 28 U.S.C. § 2254.  Each ground is explained in more detail in the attached Memorandum of Law in Support of Petitioner's Petition. On the constitutional issues raised in this petition, the state court "adjudication of the claim . . . resulted in a decision that was contrary to, [and] involved an unreasonable application of, clearly

established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Further, the state court decision on the relevant factual questions was unreasonable. *See* U.S.C. § 2254(d)(2).

FACTUAL BACKGROUND

15.     Petitioner was arrested on November 18, 2006, and charged with second-degree murder in the death of his girlfriend Lucy Alvarado. (S-227). His trial began on February 19, 2008.

16.     The prosecution's theory was that Petitioner had killed Ms. Alvarado out of jealousy. However, the evidence was largely circumstantial. The only direct evidence of Petitioner's guilt came from Kevin Morrissey, a jailhouse informant who testified that Petitioner had confessed to him that he had killed Ms. Alvarado.

17.     According to Morrissey, Petitioner confessed to him in June 2007, when the two men were being held in the "bullpens" in the Bronx County Criminal Courthouse while waiting to appear in court.  (A-164 to A-165).

18.     Morrissey, however, did not tell anyone about the purported confession until September 21, 2007, when he wrote a letter to a U.S. Marshal claiming that he "couldn't sit with this."  (A-174, 177).  Eventually, Morrissey met with ADA Aaron Kaplan, the prosecutor assigned to Petitioner's case, toward the end of September or early October 2007.  (A-175).

19.     According to Morrissey, at that initial meeting, no promise was made to him in return for his testimony at Petitioner's trial, and he was prepared to testify solely because "it's the right thing to do."  (A-178).

20.     At Petitioner's trial, Morrissey testified that he was facing felony charges, including grand larceny, in five different jurisdictions. (A-154).  He said that he had pled guilty to four of his five currently pending charges, including charges in Brooklyn, Queens, Nassau, and Suffolk Counties in New York.  (A-155).  The only a charge he had not yet pled guilty to was a charge he faced in Bergen County, New Jersey.  (A-155).

21.     Morrissey said he was awaiting sentencing in his New York cases, "pending my testimony here."  (A-156).  When asked what his minimum sentence for those crimes was, he answered "two to four," with a maximum of "three-and-a-half to seven years."  (A-157).

22.     Morrissey testified about a cooperation agreement he had signed with the Kings County and Bronx County DA offices.  (A-158; see also A-112 to A-115 (cooperation agreement)). Morrissey said the agreement called for his truthful testimony in Petitioner's case in exchange for the Bronx DA's "recommendation as to the minimum sentence, but there are no guarantees." (A-159).

23.     The written cooperation agreement between Morrissey and the prosecution stipulated that, in exchange for his testimony at Petitioner's trial, the Kings DA would recommend that Morrissey receive a "lesser sentence" in Kings County of "2-4 years incarceration, or the Willard Program," (A-113 at ¶ 7), to run concurrently to his other sentences.  (A-112 to A-115 (cooperation agreement)).

24.     In addition, the agreement explained that after testifying at Petitioner's trial, Morrissey's cooperation with the Bronx DA would be made known to Kings County, as well as to other jurisdictions.  (A-114 at ¶ 12).  Nothing in the agreement required ADA Kaplan to do anything, or provide any benefit to Morrissey, before Petitioner's trial.

25.     When asked how the *Willard* drug treatment program had been "incorporated within the agreement," Morrissey stated that *Willard* had been "listed" in the written agreement as a possible sentence in the event of his truthful testimony.  (A-160).

26.     After cross-examination of Morrissey, ADA Kaplan asked him questions about his sentence in New Jersey:

Q:      You mentioned on cross-examination the Bergen County case, remember that?
A:      Bergen County case, correct.
Q:      Have you even pleaded guilty on that case yet?
A:      No. I've been trying to though.
Q:      But you haven't pleaded guilty yet?
A:      No.
Q:      Do you have any idea whether or not what you do in this courtroom has any relationship to Bergen County?
A:      None whatsoever.

(A-211 to A- 212).  Kaplan did not correct this testimony, which (as discussed below) was not true.

27.     Morrissey's testimony did not reveal the full extent to which he had an incentive to testify favorably for the prosecution, or his profound unreliability as a witness.  Morrissey did not fully describe his documented history of severe mental illness, nor his history as a jailhouse informant for the Bronx DA.

28.     First, Morrissey had been repeatedly diagnosed—over a span of at least fifteen years— with psychosis, psychotic disorder, schizophrenia, addiction, depression, memory problems, confusion, auditory hallucinations, and cocaine addiction.  (S-181, S-191 to S-192, S-194, S-203 to S-204, S-212).  His mental illness had been discussed extensively at proceedings in various cases.  In a 1993 case, Morrissey's schizophrenia diagnosis was noted multiple times and Morrissey himself stated that he was taking "11 different medications to control my mental

7

illness," including an "antipsychotic."  (S-233).  In a different 1993 case, the judge had reviewed

a psychiatric report and determined that Morrissey was a "faker, a malingerer who lies for his

own advantage, and that he is not to be trusted and simply manipulates medical matters for what

he considers to be his own benefit."  (S-234 to S-235).

29.     The most recent schizophrenia diagnosis had come in 2007, only months before

Morrissey claimed Petitioner had confessed to him.  (S-212).  That diagnosis had arisen in

connection with Morrissey's conviction in Queens County—the same conviction that he

discussed at Petitioner's trial.  The record of that case contained an "After Care Letter" from

Correctional Health Services stating that Morrissey had "Schizophrenia."  (S-212).  To treat his

schizophrenia, Morrissey had been prescribed the drug Zyprexa.  (S-212, S-235).  Morrissey had

also undergone competency evaluations in connection with charges against him in 1993, 2000,

and 2007.  (S-109, 110, 214, 235).

30.     Second, although Morrissey's cooperation with the Bronx DA in a prior case, *People v.
Ricardo Jiminez*, was briefly mentioned at Petitioner's trial, the full history of that cooperation

was not.  That prior cooperation is critical to understanding the full and undisclosed scope of

benefits Morrissey received for his testimony in Petitioner's case.

31.     Prior to Petitioner's case, Ricardo Jiminez was charged in Bronx County with murder and

convicted, in part, on the basis of testimony by Morrissey, who testified that the Mr. Jiminez had

confessed to committing murder while the two shared a cell.  (A-082; A-075 to A-076; Ex. 5 at

171; see also Ex. 1 at 10).  At the time of Jiminez's trial, Morrissey faced the same set of five

charges as he did during Petitioner's trial.  Morrissey testified against Jiminez in exchange for a

promise by the Bronx County ADA assigned to the Jiminez case—Lisa Mattaway— to call the Queens County DA's office.  (A-083 to A-086; see also Ex. 1 at 10).

32.     Ultimately, however, Morrissey's efforts failed, and he did not receive the help he was looking for from ADA Mattaway.  Thus, after his testimony in the Jiminez case, Morrissey still faced felony charges in five jurisdictions and feared he might not receive what he coveted most: a "Willard" sentence.

33.     In August 2007 (after Petitioner's alleged confession but before Morrissey had told anyone about it), Morrissey pleaded guilty to his felony in Nassau County.  Crucially, the judge at Morrissey's plea hearing made no mention of *Willard*.  (A-268 to A-269). Only after this did Morrissey come forward with Petitioner's alleged confession, writing the letter to the U.S. Marshal.

34.     Shortly before meeting ADA Kaplan for the first time, Morrissey wrote to ADA Mattaway and claimed that he and his family had been receiving threats as a result of his cooperation in the Jiminez case. Mattaway referred Morrissey's wife to the New York Crime Victims Assistance Unit ("CVAU").  (Ex. 5 at 197).

35.     Mattaway also reached out to ADA Kaplan, the lead prosecutor in Petitioner's case, to inform him of the situation.  On September 28, 2007, a day after meeting Morrissey for the first time, Kaplan set up a conference with an employee at CVAU to inquire further about helping Morrissey's wife relocate.  (A-007; Ex. 5 at 49-50).

36.     On October 27, 2007, one of Morrissey's attorneys, Norman Trabulus, emailed Kaplan and told him that Morrissey's wife had been told she was ineligible for help from the CVAU.  In

an email to Kaplan labeled "Important," Mr. Trabulus stated, "My best guess is that *he will not testify unless* she and the child are moved." (A-004 (emphasis added)). On October 30, 2007, Kaplan followed up again with the CVAU employee to find out if "in fact we are out of options," and made sure to copy Morrissey's attorney on the email. (A-004). Kaplan himself would later say that he was Morrissey's "conduit" to CVAU. (Ex. 5 at 30).

37.     On January 18, 2008—ten days after Morrissey signed the written agreement with the Bronx/Kings DAs—the CVAU representative spoke one more time with Morrissey's wife, this time concerning Morrissey's wife's recent housing interview. (A-007). The CVAU representative followed up with ADA Kaplan that same day to inform him of the conversation with Morrissey's wife. (A-007). Thus, Kaplan was receiving updates on the status of assistance provided to Morrissey's wife by the CVAU as late as January 18, 2008, only a month before Petitioner's trial began.

38.     ADA Kaplan also made various calls to the Queens DA on Morrissey's behalf prior to Morrissey's testimony at Petitioner's trial. These calls were not disclosed to Petitioner before trial, and the jury heard nothing about them.

39.     The written agreement between the government and Morrissey did not call for any discussions between ADA Kaplan and other jurisdictions prior to Morrissey's testimony. Nonetheless, prior to Petitioner's tria,l Morrissey's attorney emailed Kaplan to say that Morrissey was worried about the sentence he might face for his felonies in Queens County. Specifically, Mr. Trabulus asked Kaplan to call the ADA in Queens and "ensure [Morrissey] gets Willard there too." (A-116). Kaplan immediately agreed to make the call, emailed back a few hours later to say that he had had a "substantive conversation" with the Queens ADA, that she

was now "aware of all the Willard stuff," and that the pair's conversation about Willard would continue once the time came to sentence Morrissey in Queens. (A-116 to A-118). Mr. Trabulus emailed back that this information "reassured" Morrissey. (A-118). Kaplan's calls to the Queens DA on Morrissey's behalf prior to Petitioner's trial were not disclosed. Kaplan also spoke with prosecutors in Suffolk and Nassau Counties before Petitioner's trial. (Ex. 5 at 79-81).

40.     The written agreement between Morrissey and the government, as noted, called for ADA Kaplan to inform other jurisdictions of Morrissey's cooperation at Petitioner's trial after that cooperation occurred. (A-114 at ¶ 12). This agreement would have covered the prosecutor's office in Bergen County, New Jersey, where Morrissey faced criminal charges. Nonetheless, ADA Kaplan allowed Morrissey to testify at trial that his testimony would have no connection— "none whatsoever"—to his sentencing in New Jersey. (A-212).

41.     Moreover, immediately after Morrissey's testimony in Petitioner's trial, Kaplan promised to call the prosecutor in Bergen and to write a letter detailing Morrissey's cooperation in Petitioner's case, which he ended up doing. (A-217; A-372 to A-373; Ex. 5 at 58-62)

42.     Ultimately, following ADA Kaplan's assistance, Morrissey received the desired *Willard* sentence for each of his four New York convictions. (A-291 to A-299; A-306; A-224; S-723). In Bergen County, New Jersey, Morrissey received a non-custodial probation sentence. (A-354).

<u>GROUNDS FOR RELIEF</u>

*Ground One: the prosecution violated* Brady v. Maryland *by failing to disclose the assistance provided to informant Kevin Morrissey.*

Petitioner's conviction for murder in the second degree rests on circumstantial evidence and the testimony of Morrissey. Morrissey testified at Petitioner's trial that Petitioner had

11

confessed to killing his girlfriend while the two men shared a holding cell at the Bronx Criminal Courthouse for a few hours.

The first paragraph of the cooperation agreement between Morrissey and the prosecution stated that it "constitutes the entire and exclusive agreement between" Morrissey and the prosecution.  (A-112 at ¶ 1).  But that was not true.  Rather, the evidence showed that the prosecutor provided various benefits prior to trial that were not disclosed, including his attempts to (1) relocate Morrissey's wife and (2) assist Morrissey in his quest for more lenient sentences in jurisdictions other than Kings County, including Queens County.

This claim was not raised on direct appeal because the facts underlying the claim were not discovered until after Petitioner's conviction became final.  The ground was raised properly in Petitioner's post-conviction motion for relief in state court under N.Y. Crim. Proc. L. § 440.10, and in Petitioner's application for leave to appeal the denial of that motion.

The 440 Court rejected this claim, applying a more restrictive legal standard that required Petitioner to show that disclosure of this evidence "would have" changed the result at trial. Because the 440 Court's decision rests on an unreasonable application of clearly established law, and Petitioner has met each of the elements of *Brady,* the writ should issue.

*Ground Two: the prosecution violated* Napue v. Illinois *by failing to correct the informant's false testimony.*

The Bronx DA failed to correct Morrissey's false testimony at Petitioner's trial that Morrissey's cooperation would have no connection "whatsoever" to his then-pending New Jersey criminal case. Under clearly established Supreme Court precedent, the prosecutor should have corrected Morrissey's misstatement at trial—which were elicited by the prosecutor himself in an effort to rehabilitate his witness.

This claim was not raised on direct appeal because the facts underlying the claim were

not discovered until after Petitioner's conviction became final.  The ground was raised properly in Petitioner's post-conviction motion for relief in state court under N.Y. Crim. Proc. L. § 440.10, and in Petitioner's application for leave to appeal the denial of that motion.

Because Petitioner successfully demonstrated a claim for relief under clearly established Supreme Court precedent, and because the state court relied on unreasonable determinations of fact in its decision, the writ should issue.

*Ground Three: Petitioner's trial counsel was constitutionally ineffective under* Strickland v. Washington *for failing to investigate and uncover the informant's history of mental illness.*

Morrissey had a documented history of mental illness that went back years before Petitioner's trial.  Morrissey had been repeatedly diagnosed with psychosis, psychotic disorder, schizophrenia, addiction, depression, memory problems, confusion, auditory hallucinations, and cocaine addiction.  (S-181, S-191 to S-192, S-194, S-203 to S-204, S-212).

Petitioner's counsel failed to exercise due diligence to explore Morrissey's criminal history, which would have revealed evidence of Morrissey's extensive mental health issues, including his schizophrenia and psychosis diagnoses.  This devastating impeachment evidence, which showed that Morrissey had been diagnosed with and prescribed medication for psychological disorders that affect the ability to distinguish reality from fiction, could only have greatly diminished Morrissey's credibility in the eyes of the jury.

This claim was not raised on direct appeal because the facts underlying the claim were not discovered until after Petitioner's conviction became final.  The ground was raised properly in Petitioner's post-conviction motion for relief in state court under N.Y. Crim. Proc. L. § 440.10, and in Petitioner's application for leave to appeal the denial of that motion.

The state court unreasonably applied *Strickland* and because its clearly erroneous holding was infected by its unreasonable determination of fact and application of law, and Petitioner has

satisfied each element of *Strickland*, the writ should issue on this ground as well.

43.     All claims raised in the Petition have been presented to the highest state court having

jurisdiction, which in the case of Petitioner's § 440.10 motion was the Supreme Court, Appellate

Division, First Department.

<u>REQUIRED INFORMATION</u>

44.     Petitioner has not previously filed any type of petition, application, or motion in a federal

court regarding this conviction.

45.     Petitioner does not currently have any appeal now pending in any court.

46.     Petitioner's counsel at his pre-trial suppression hearing, trial and sentencing was Robert

H. Johnston, 1579 Metropolitan Avenue, Suite 10A, Bronx, New York, 10462.

        Petitioner's counsel on appeal was Richard M. Greenberg, Office of the Appellate

Defender, 11 Park Place, Suite 1601, New York, NY 10007.

        Petitioner's counsel in post-conviction proceedings was Richard M. Greenberg, Office of

the Appellate Defender, 11 Park Place, Suite 1601, New York, NY 10007.

        Petitioner's counsel on appeal from the Supreme Court's denial of his § 440.10 motion

was Rosemary Herbert, Office of the Appellate Defender, 11 Park Place, Suite 1601, New York,

NY 10007.

47.     Petitioner does not have any future sentence to serve after he completes the sentence for

the judgment of conviction he is challenging in this Petition.

48.     As more fully explained in the attached Memorandum of Law, the Petition is timely

because it is filed within one year of the Appellate Division's June 29, 2017 denial of leave to

appeal the denial of Petitioner's § 440.10 motion.

WHEREFORE, Felipe Arroyo prays that this court:

      1.      Grant a writ of habeas corpus vacating Petitioner's judgment of conviction, and order that Petitioner be released or retried within sixty days.

      2.      Permit Petitioner, who is indigent, to proceed without prepayment of costs or fees;

      3.      Grant such other and further relief as may be just and proper.


Respectfully submitted,

Dated: June 27, 2018      By: _____

      Evan H. Stein (ES-2139)
      HOLWELL SHUSTER & GOLDBERG LLP
      750 Seventh Avenue, 26th Floor
      New York, NY 10019
      (646) 837-5151
      estein@hsgllp.com

      Christina Swarns
      Anastasia B. Heeger (AH-9640)
      OFFICE OF THE APPELLATE DEFENDER
      11 Park Place, Suite 1601
      New York, NY 10007
      (212) 402-4100

      *Attorneys for Petitioner*

<u>VERIFICATION</u>

EVAN H. STEIN, ESQ., an attorney duly admitted to practice in the State of New York, hereby affirms under penalties of perjury:

I am an attorney for the Petitioner, FELIPE ARROYO, in this habeas corpus proceeding, and I have read the foregoing petition. As to matters within my personal knowledge, I allege that such matters stated therein are true. As to other matters stated therein, I allege on information and belief that they are true. Such information and belief is based on my examination of court records and transcripts pertaining to this case.

Dated: New York, New York
       June 27, 2018

EVAN H. STEIN