USDG SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/28/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FELIPE ARROYO,                                  :
                                                :
                    Petitioner,                 :
                                                :
        -against-                               :        18-CV-5819 (PGG) (JLC)
                                                :
STEWART ECKERT,                                 :
                                                :
                    Respondent.                 :
-------------------------------------------------------------X

## REPORT & RECOMMENDATION

<u>TABLE OF CONTENTS</u>

I.    BACKGROUND ......................................................................................... 1
    A.    Arrest and Indictment ..................................................................... 1
    B.    The Trial .......................................................................................... 1
        1.    Overview of Trial Testimony ................................................ 2
        2.    Kevin Morrissey's Testimony ............................................... 4
        3.    The Defense Case ................................................................. 6
        4.    Verdict and Sentencing ........................................................ 6
    C.    Post-Conviction Proceedings ......................................................... 7
        1.    Direct Appeal ....................................................................... 7
        2.    440 Proceedings ................................................................... 7
        3.    The Instant Habeas Petition .............................................. 12
II.   DISCUSSION ........................................................................................... 13
    A.    Legal Standards for Habeas Corpus Relief Under Section 2254 .......... 13
        1.    The Exhaustion Doctrine ................................................... 13
        2.    Procedural Bar to Claims Deemed Unexhausted ............. 14
        3.    Standard of Review Under AEDPA .................................. 14
    B.    Analysis .......................................................................................... 16
        1.    *Brady* Claims ...................................................................... 16
            a.    Efforts to Relocate Morrissey's Family ..................... 20
                i.    Evidence about efforts to relocate Morrissey's wife
                      was not disclosed ................................. 21
                ii.    Evidence about efforts to relocate Morrissey's wife
                      was not favorable ................................. 22
                iii.   Evidence about efforts to relocate Morrissey's wife
                      was not material ..................................  26
            b.    Communications with Other Jurisdictions ........................... 31
                i.    Evidence about communications with other
                      jurisdictions was not disclosed .................... 33
                ii.    Evidence about communications with other
                      jurisdictions was favorable ........................ 34
                iii.   Evidence about communications with other
                      jurisdictions was not material ..................... 37
        2.    *Napue* Claim ...................................................................... 38
            a.    Morrissey's testimony about Bergen County was false,
                  ADA Kaplan should have known it was false, and the
                  false testimony went uncorrected ...................... 40
            b.    Defense counsel should have corrected Morrissey's
                  testimony on re-cross examination ..................... 41
            c.    The testimony was not prejudicial ..................... 44
        3.    Ineffective Assistance of Counsel Claim ......................... 45
            a.    Trial Counsel's failure to investigate and use Morrissey's
                  psychiatric history was not prejudicial ............... 48

       b.     Trial counsel's performance was not deficient ................... 50

III.    CONCLUSION .................................................................................. 53

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Paul G. Gardephe, United States District Judge:**

Petitioner Felipe Arroyo seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 following his conviction of murder in the second degree.  He was sentenced to an indeterminate prison term of 25 years to life.  For the reasons set forth below, the petition should be denied.

## I.    BACKGROUND

### A.    Arrest and Indictment

Arroyo was arrested on November 19, 2006 for the murder of his girlfriend Lucy Alvarado.  Trial Transcript ("TR") at 185–86.[1]  On November 27, 2006, a grand jury indicted Arroyo on the charge of second-degree murder.  On February 19, 2008, Arroyo proceeded to trial before the New York State Supreme Court Justice John Carter and a jury.

### B.    The Trial

The following facts are drawn from the record of proceedings before the state trial court.  In view of Arroyo's conviction, the evidence presented at trial is summarized in the light most favorable to the verdict.  *See, e.g.*, *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012) (citation omitted).

---

[1] The state court record is filed at docket entry 5.  The trial transcript ("TR") is filed as Exhibit 5 (Dkt. Nos. 5-26 through 5-27).  The sentencing transcript ("TS") is filed as part of Exhibit 5 (Dkt. No. 5-27).  Pinpoint citations to these filings refer to the pagination that runs throughout the documents, and not to the pagination generated by this District's Electronic Case Filing system.

1. **Overview of Trial Testimony**

On November 18, 2006, Lucy Alvarado was found dead in the bedroom of her Bronx home by her sister and her mother. TR at 78–79. Alvarado's body was lying face down on her bed, her head had been "bashed in," and the room was covered in blood. *Id.* at 93, 120. A medical examiner testified that Alvarado had likely died between 9:00 p.m. on November 17 and noon on November 18 from at least seven to ten blows to her head. *Id.* at 563, 577, 617, 622. Alvarado's body was bloody and bruised, she had multiple lacerations on her face and head, and her eyes were "swollen and purple." *Id.* at 556–58, 578. She died as a result of "blunt force injury to the head, with [ ] multiple fractures of the skull and [ ] multiple injuries of the brain." *Id.* at 563. She had no defensive wounds. *Id.* at 579. A murder weapon was never recovered. *Id.* at 257, 286. Empty beer bottles recovered from the bedroom had Arroyo's fingerprints on them. *Id.* at 256, 411. There was no sign of forced entry or exit to or from the apartment. *Id.* at 168–69.

Lucilla Brillon, Alvarado's mother, lived with Alvarado, Alvarado's three children, and Arroyo. *Id.* at 297. She testified that Alvarado and Arroyo had a relationship where "[o]ne moment they were treating each other good and the next they were treating each other bad." *Id.* at 301. She stated that she saw Arroyo and Alvarado the evening of November 17 together in their bedroom at around midnight. *Id.* at 305–06.[2] The next morning, November 18, she testified that she

---

[2] On the night of November 17, only Brillon and Alcides, Alvarado's eight-year-old son, were at home with Arroyo and Alvarado. TR at 304, 361. Alvarado's two daughters were spending the night at the home of Alvarado's adult daughter,

saw Arroyo leave the bedroom at approximately 11:00 a.m. and go to the kitchen; she testified that Arroyo "opened the refrigerator, he didn't take anything, he didn't look at [her] face. He kept on walking straight and he began to [shake both of his hands behind his back]." *Id.* at 307–09. She also testified that only three people had keys to the apartment—herself, Alvarado, and Arroyo. *Id.* at 310.

Detectives found Arroyo on the evening of November 18. Arroyo agreed to accompany detectives to the precinct. *Id.* at 172–73. He appeared to be intoxicated and, when told Alvarado had been murdered, stated that he did not believe it. *Id.* at 174, 177. The detectives allowed him to rest through the night. *Id.* at 181. The next evening, Arroyo was formally arrested. *Id.* at 185–86. When he was being transferred to a holding cell, a detective asked Arroyo if he knew what was happening. Arroyo replied, "[i]f I did something, I don't remember it." *Id.* at 234–35.

---

Geneva Velasquez. *Id.* at 359. Arroyo paid for their taxi to Velasquez's home, which he had never done before. *Id.* at 360. Ivelise Lopez, one of Alvarado's daughters, testified that she called her mother around 7:30 p.m. to let her know that they had arrived. *Id.* at 361–62. Arroyo then called back several times to verify that they were at their sister's house and asked when they would return. *Id.* at 361–64. Velasquez found this behavior strange because he would usually not call. *Id.* at 61–62. She also testified that it sounded like Arroyo and Alvarado had been arguing. *Id.* at 64.

Arroyo's ex-wife, Nancy Quinones, testified that later that evening he called her around 11:00 p.m. and told her that he had been thrown out of the house by Alvarado and he wanted to see her and his children, but Quinones refused to see him. *Id.* at 138, 143. The next morning, Arroyo called her again. *Id.* at 141. When she again refused to see him, Arroyo visited his sister-in-law, Leal-Antico Gonzalez, at around 7:00 a.m. *Id.* at 159. He went immediately to a bedroom that he often used and Gonzalez testified that she heard the water running. *Id.* at 160–61. Gonzalez also stated that Arroyo kept clothes at her apartment. *Id.* at 159.

3

Prior to November 18, 2006, Arroyo had threatened Alvarado's life on at least two occasions.  Ivelise Lopez, Alvarado's daughter, testified that about a month before her mother was killed, Arroyo and Alvarado had an argument during which "he [ ] threw everything off the washing machine and it hit the floor and it broke and she got mad, [and they] started arguing louder."  *Id.* at 383.[3]  According to Lopez, Arroyo then told Alvarado, "I'm going to [f-in]g kill you."  *Id.*  Angel Torres, Alvarado's nephew, testified that he overheard Arroyo telling Alvarado several times that if she cheated on him, he was "going to break [her] head open."  *Id.* at 41–42.

### 2.  **Kevin Morrissey's Testimony**

The prosecution also presented testimony from Kevin Morrissey, who testified that he first met Arroyo when the two were housed in the same dorm on Rikers Island in February 2007.  *Id.* at 480.  Morrissey stated that Arroyo subsequently confessed to Alvarado's murder when they were both being held in "bullpens" in the Bronx County Criminal Courthouse in June 2007.  *Id.* at 482–83. He testified that Arroyo told Morrissey that he was accused of killing his girlfriend, Lucy.  *Id.* at 484, 487.  Morrissey testified that Arroyo was "gleeful because he seemed to feel he was going to walk away on this case, [as] there was no direct evidence against him."  *Id.* at 487.  Arroyo then confided that one night he and Alvarado "got into an argument.  She was going to call the police on him again [so]

---

[3] Brillon also testified that Arroyo had previously broken a window in the home: "I think he hit them with a hammer or something because the glass fell all to the floor."  TR at 314.

he picked up a banger and hit her in the head . . . [T]here was blood all over the place and he put her back into the bed . . . under the covers, and he left the apartment." *Id.* at 488–89. On September 21, 2007, because "[he] couldn't sit with this [information]," Morrissey sent a letter to the United States Marshal's office repeating what Arroyo had told him. *Id.* at 492–95.

At the time of Arroyo's trial, Morrissey was facing grand larceny charges in five separate cases in Kings, Nassau, Suffolk, Queens, and Bergen (New Jersey) Counties. *Id.* at 472, 519. His sentencing in those cases was "pending [his] testimony" in the Arroyo case. *Id.* at 474. At Arroyo's trial, Morrissey testified to having been convicted of "[m]ore than [20]" financial crimes. *Id.* at 472. These crimes involved altering money orders, printing counterfeit checks, and other fraudulent activities. *Id.* at 473.

Prior to the Arroyo trial, Morrissey had entered into a cooperation agreement with the Bronx and Kings County District Attorney's Offices ("DAs"). *Id.* at 476–77. In exchange for his truthful testimony in the Arroyo case, the assistant district attorney ("ADA") would make a recommendation in Kings County of the minimum sentence, or a so-called *Willard* sentence. *Id.* at 477–79.[4] Morrissey also testified that he had taken an open plea in Queens; if he continued to cooperate with the Bronx DA's Office, he would receive the minimum sentence served concurrently with his other sentences. *Id.* at 481.

---

[4] A *Willard* sentence refers to a drug treatment program that substitutes for a term of incarceration. *See* NYCPL § 410.91(1).

On cross-examination, Morrissey admitted to using false aliases to avoid arrest, and detailed the crimes he had committed in his five pending cases. *Id.* at 513–19. He testified that if all his sentences ran consecutively, he could be in prison for a maximum of 35 years. *Id.* at 521. As a result of his cooperation, Morrissey acknowledged that his sentences in all his cases would run concurrently for a total of two to four years in prison. *Id.* at 521–22. Morrissey also stated that he had "so much pretrial detention, [he was] going on 19 months in custody," and was "pretty close" to his minimum sentence considering the time he had already served. *Id.* at 520, 522. Defense counsel thus characterized Morrissey's cooperation as his "get out of jail card." *Id.* at 522. Morrissey also testified that he had been a cooperating witness in "[a]bout seven, eight, could be ten" other cases, at least one of which had already resulted in a conviction. *Id.* at 523–24. Finally, he admitted to using other inmates' pin numbers while incarcerated to make unauthorized telephone calls. *Id.* at 526–27.

### 3.    **The Defense Case**

Defense counsel called one witness, Arroyo's sister Milady Arroyo, who testified that she saw him the morning of November 18 and did not see any blood on his clothing. *Id.* at 632–34. Arroyo did not testify.

### 4.    **Verdict and Sentencing**

On March 5, 2008, the jury convicted Arroyo of murder in the second degree. *Id.* at 812. On April 1, 2008, the court sentenced him to an indeterminate term of 25 years to life. TS at 14.

C.    **Post-Conviction Proceedings**

1.    **Direct Appeal**

On December 30, 2010, Arroyo appealed his conviction to the Appellate Division, First Department.  He did not bring any of the claims currently at issue in his habeas petition.  *See* Dkt. No. 17-1.  His conviction was affirmed on October 13, 2011.  *People v. Arroyo*, 88 A.D.3d 495 (1st Dep't 2011).  Arroyo sought leave to appeal his conviction to the New York Court of Appeals, which was denied on March 6, 2012.  *People v. Arroyo*, 18 N.Y.3d 955 (2012).

2.    **440 Proceedings**

On April 16, 2012, Arroyo, represented by counsel, filed a motion to vacate the judgment of conviction, pursuant to New York Criminal Procedure Law ("NYCPL") § 440.10.  *See* S-219.[5]  Arroyo alleged that: (1) newly discovered evidence that Morrissey once suffered a psychiatric disorder was not disclosed to the jury and thus "cast doubt" on the conviction; (2) the prosecution had violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose Morrissey's psychiatric history; and (3) Arroyo's trial counsel was ineffective for failing to obtain publicly-available information about Morrissey's psychiatric condition.  S-237–48.

---

[5] The state court record of the 440 motion is filed at docket entry 5.  Submissions related to the motion ("S") are filed as Exhibit 2 (Dkt. Nos. 5-2 through 5-20).  Exhibits related to the motion ("A") are filed as Exhibit 3 (Dkt. Nos. 5-21 through 5-23).  The 440 hearing transcript ("T") is filed as Exhibit 4 (Dkt. Nos. 5-24 through 5-25).  Pinpoint citations to these filings refer to the pagination that runs throughout the documents, and not to the pagination generated by this District's Electronic Case Filing system (*e.g.* Arroyo's 440 motion is located at S-219 through S-248).

On August 20, 2013, Arroyo filed a supplemental brief because he had obtained documents allegedly demonstrating that Morrissey had received several undisclosed benefits from the Bronx DA's Office.  S-328–34.  The documents concerned Morrissey's involvement with the Bronx DA's Office in another trial, *People v. Jimenez*, 847 N.Y.S.2d 904, 2007 WL 2390704 (N.Y. Sup. Ct. 2007), which had concluded a few months prior to Arroyo's trial.  Morrissey had testified at that trial that defendant Jimenez had confessed to him when they were both incarcerated at Rikers Island.  A-075, 082.  Following the guilty verdict in that case, Morrissey sent a letter to the ADA assigned to the Jimenez case asking her to "get [his wife and child] safe," as he feared for their security after his testimony.  A-089.

On September 28, 2007, ADA Kaplan, who was assigned to the Arroyo case, set up a conference with the Crime Victims Assistance Unit ("CVAU") of his office to inquire further about helping Morrissey's wife relocate.  A-007.  ADA Kaplan also corresponded with Norman Trabulus, one of Morrissey's attorneys, about Morrissey's concerns.  In an email dated October 27, 2007, Trabulus explained to ADA Kaplan that Morrissey had been told his wife could not be relocated.  A-004. He further opined: "My best guess is Kevin [Morrissey] will not testify unless she and the child are moved."  *Id.*  ADA Kaplan then sent an email to the CVAU representative, Iris Negron, asking if "in fact we are out of options."  *Id.*  The CVAU continued to communicate with Morrissey's family and kept ADA Kaplan informed of their efforts at least through January 18, 2008.  A-007–008.  Morrissey's family

8

ultimately did not receive any assistance from the Bronx DA's Office and moved on their own prior to the Arroyo trial.  T-112, 169.

Other emails between Trabulus and ADA Kaplan in January 2008 also suggested that ADA Kaplan had been in communication with the Queens DA's Office concerning Morrissey's cooperation in the Arroyo trial.  A-116–19.

On January 24, 2014, Justice Carter ordered a hearing pursuant to NYCPL § 440.10(5) to address issues related to "additional benefits that may have been afforded to the jailhouse informant immediately preceding his testimony in this case."  S-449.  The hearing was held on several dates between September 23, 2014 and December 16, 2015.  ADA Kaplan, ADA Lisa Mattaway (the prosecutor in the Jimenez case), BethAnn Holzay (Director of the Bronx CVAU), and Trabulus were called as witnesses.  At the hearing, ADA Kaplan testified that Trabulus asked him to contact the Queens DA about Morrissey's sentence in Queens.  T-069.  He called and "asked them whether or not they would consider the possibility of allowing [Morrissey] to get a sentence of *Willard*."  T-074.  ADA Kaplan also stated that he communicated with prosecutors in Bergen County after the trial had concluded to inform them of Morrissey's cooperation for logistical purposes.  T-282.  He denied "promis[ing Morrissey] anything with respect to any other county outside of what's encompassed in the cooperation agreement executed between [himself], [Morrissey] and Kings County."  T-094–95, 103–05.  Both ADA Kaplan and Trabulus testified that Morrissey was willing to cooperate regardless of whether his family was

relocated, and in any case efforts to relocate them were ultimately unsuccessful. T-039, 112, 143, 166.

On February 1, 2016, Arroyo filed a post-hearing submission contending that multiple pieces of *Brady* material were not disclosed by the prosecution (including the Bronx DA's efforts to relocate Morrissey's family and ADA Kaplan's advocacy for Morrissey in cases in New York and New Jersey). Arroyo also argued that ADA Kaplan failed to correct trial testimony by Morrissey that his sentencing in New Jersey would have no relation to the Arroyo case, when his cooperation agreement required the prosecutors to notify other counties of Morrissey's cooperation after the trial. S-601–12.[6]

On January 13, 2017, the court ("440 Court") denied Arroyo's motion. *See* Decision and Order ("440 Decision"), Supreme Court of the State of New York, Bronx County, January 13, 2017, Dkt. No. 5, Ex. 1. First, the 440 Court found that the prosecution had adequately turned over Morrissey's rap sheet, which presented Morrissey's history of psychiatric disorders, defense counsel had independent access to the material, and thus there was no resulting *Brady* violation. *Id.* at 15–16. The court also observed that because Morrissey had been found to be a "malingerer," (*id.* at 15) impeachment on the topic "would have had little value[,] revealing only that Morrissey was not psychotic, or delusional but a manipulator." *Id.* at 17. Therefore, the court concluded that Arroyo's trial counsel was not ineffective for

---

[6] Morrissey ultimately received only a term of probation in Bergen County. One of the factors for this sentence was "cooperat[ion] with law enforcement authorities." S-490.

failing to discover Morrissey's psychiatric history and failing to pursue such a line of questioning. *Id.* at 35–36.

Second, the court observed that ADA Kaplan's effort to help Morrissey's wife relocate was not favorable to Arroyo because he ultimately did not succeed in helping them move. *Id.* at 22–23. The court also found that ADA Kaplan's communications with other counties regarding Morrissey's sentences were "logistical in nature," and did not constitute additional benefits beyond what was laid out in the cooperation agreement, which had been disclosed. *Id.* at 28. The court concluded that the undisclosed evidence was also not material because there was "no reasonable probability or possibility that the result of the trial would have been different if the jury heard all or even some of this information." *Id.* at 33. The court thus found no *Brady* violations.

Finally, the 440 Court found that Morrissey did not make a false statement concerning the relationship between his testimony and his sentence in Bergen County, and thus ADA Kaplan was under no obligation to correct it. *Id.* at 31–32. The court observed that at the time of the trial, Morrissey was "unaware of the sentence he was facing there and both ADA Kaplan and Mr. Trabulus testified that there was no promise regarding Bergen County." *Id.* at 31.

On March 17, 2017, Arroyo sought leave to appeal the denial of his motion to the Appellate Division. Dkt. No. 17-3. On June 29, 2017, the Appellate Division First Department denied his leave to appeal. Dkt. No. 17 ¶ 34 (citing *People v. Arroyo*, M-1407, 2017 N.Y. Slip Op. 78659(U) (Tom, J.)).

### 3.    __The Instant Habeas Petition__

On June 28, 2018, Arroyo, represented by counsel, filed a timely petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254, Dkt. No. 5, along with a memorandum of law.  Dkt. No. 3 ("Pet. Mem.").  Arroyo presents three claims in his petition.  Pet. Mem. at 25.  First, he contends that the Bronx DA's Office violated *Brady* by failing to disclose the full extent of its efforts to assist Morrissey, and in particular its attempts to relocate Morrissey's family, and its communications with other jurisdictions about Morrissey's sentencing.  *Id.* at 25, 29.  Second, he argues that the Bronx DA's Office violated *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to correct Morrissey's testimony that his cooperation in the Arroyo trial had no relation to his sentence in Bergen County.  *Id.* at 25.  Third, he claims that his trial counsel was ineffective for failing to uncover Morrissey's history of mental illness.  *Id.*

By order of reference dated July 12, 2018, this matter was referred to me for a report and recommendation.  Dkt. No. 7.  On January 11, 2019, respondent filed his opposition, Dkt. No. 17, along with a memorandum of law.  Dkt. No. 18 ("Res. Mem.").  On March 15, 2019, Arroyo filed a reply in further support of his petition (Dkt. No. 21 ("Pet. Reply")) and requested oral argument (Dkt. No. 22).  The Court held oral argument (Dkt. No. 26 ("OA")) on July 22, 2019.[7]

---

[7] Pinpoint citations to the oral argument transcript refer to the pagination that runs throughout the document.

## II.    DISCUSSION

### A.    Legal Standards for Habeas Corpus Relief Under Section 2254

#### 1.    The Exhaustion Doctrine

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief unless the petitioner has first exhausted his claims in state court.  *See* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant."); § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.").  The exhaustion requirement is grounded in principles of comity and federalism.  *Id.* at 844 ("Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief.") (citations omitted).

13

### 2.    <u>Procedural Bar to Claims Deemed Unexhausted</u>

"When a petitioner can no longer 'present his unexhausted claim of trial error

to the state courts,'" a federal court sitting in habeas review "deem[s] the claim

procedurally barred.'"  *Richardson v. Superintendent of Mid-Orange Corr. Facility*,

621 F.3d 196, 201 (2d Cir. 2010) (quoting *Acosta v. Artuz*, 575 F.3d 177, 188 (2d Cir.

2009)); *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) ("[A] claim is procedurally

defaulted for the purposes of federal habeas review where 'the petitioner failed to

exhaust state remedies and the court to which the petitioner would be required to

present his claims in order to meet the exhaustion requirement would now find the

claims procedurally barred.'") (quoting *Coleman v. Thompson,* 501 U.S. 722, 735

(1991)).

### 3.    <u>Standard of Review Under AEDPA</u>

The AEDPA "imposes a highly deferential standard for evaluating state-court

rulings and demands that state-court decisions be given the benefit of the doubt."

*Jones v. Murphy*, 694 F.3d 225, 234 (2d Cir. 2012) (quoting *Hardy v. Cross*, 565 U.S.

65, 66 (2011)).  Under the AEDPA, courts may only grant a habeas petition if the

challenged state court decision was (1) "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court

of the United States" at the time of the state court decision, or (2) "was based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(1)–(2).

14

Under the first prong, the "Supreme Court has instructed that section 2254(d)(1)'s 'contrary to' and 'unreasonable application of' clauses have independent meaning." *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir. 2017) (citing *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000)). "A state court decision is 'contrary to . . . clearly established Federal law, as determined by the Supreme Court' when 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Id.* at 544 (quoting *Williams*, 529 U.S. at 412–13); *see also Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (circuit precedent, even if "merely reflect[ing]" Supreme Court precedent, does not constitute "clearly established federal law"). Furthermore, "[c]learly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citations omitted).

A state court makes an unreasonable application of federal law if it "correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *Id.* at 426. Such application of federal law must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Id.* at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). "The state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quoting *White*, 572

15

U.S. at 420). The standard "is difficult to meet," and it was intended to be. *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Under the second prong, a state court's determination of fact "may not [be] characterize[d] . . . as unreasonable 'merely because [a reviewing court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Instead, § 2254(d)(2) requires a reviewing court to "accord the state trial court substantial deference. If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.*

## B.  <u>Analysis</u>

As a threshold matter, none of Arroyo's claims is unexhausted or procedurally barred (nor does respondent contend otherwise). He presented each claim at every relevant level in state court and the claims were denied on the merits rather than because of state procedural rules.

### 1.  <u>*Brady* Claims</u>

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty exists "irrespective of whether the accused made a request." *Fuentes v. Griffin,* 829 F.3d

233, 246 (2d Cir. 2016) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

"There are three components of a *Brady* violation: 'The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is

impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued.'" *Lewis v. Connecticut Comm'r of

Correction,* 790 F.3d 109, 123 (2d Cir. 2015) (quoting *Boyette v. Lefevre*, 246 F.3d 76,

89 (2d Cir. 2001)).

　　"Evidence is favorable to the accused if it either tends to show that the

accused is not guilty or impeaches a government witness." *United States v.

Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (quoting *United States v. Gil*, 297 F.3d 93,

101 (2d Cir. 2002)) (internal quotation marks omitted); *see also United States v.

Bagley*, 473 U.S. 667, 676–77 (1985); *Giglio v. United States*, 405 U.S. 150, 154

(1972).

　　Prejudice is established when a petitioner can demonstrate that the evidence

is "material." *Lewis*, 790 F.3d at 124.  "[E]vidence is 'material' within the meaning

of *Brady* when there is a reasonable probability that, had the evidence been

disclosed, the result of the proceeding would have been different." *Turner v. United

States*, 137 S. Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70

(2009)).  A "reasonable probability" of a different result "is one in which the

suppressed evidence 'undermines confidence in the outcome of the trial.'" *Id.*

(quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

In addition, "[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial." *United States v. Jackson*, 695 F. App'x 605, 607 (2d Cir. 2017) (quoting *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011)) (internal quotations omitted).

Initially, Arroyo contends that the 440 Court identified the wrong legal standard in analyzing materiality for his *Brady* claim, and thus the decision is not subject to AEDPA deference. Pet. Memo. at 40–41. He maintains that the Supreme Court's decision in *Wearry v. Cain* revised *Brady's* materiality standard when it concluded that "[e]vidence qualifies as material when there is 'any reasonable likelihood' it <u>could have</u> 'affected the judgment of the jury.'" *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (emphasis added) (internal citations omitted); *see* Pet. Mem. at 40.[8] He thus argues that the 440 Court used the incorrect materiality standard when it stated that "[m]ateriality is determined if the evidence having been

---

[8] Arroyo also focuses on a footnote in *Wearry*, where the Supreme Court observed that the petitioner could "prevail even if . . . the undisclosed information may not have affected the jury's verdict." Pet. Mem. at 40 (quoting *Wearry*, 136 S. Ct. at 1006, n.6). During oral argument, Arroyo further contended that a footnote in *Kyles v. Whitley* supports his application. OA at 10 (citing *Kyles,* 514 U.S. at 435, n.8 (expressing doubt that petitioner "must lose because there would still have been adequate evidence to convict even if the favorable evidence had been disclosed.")). However, these footnotes are dicta, and the Supreme Court has found that "[c]learly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [its] decisions." *White,* 572 U.S. at 419.

disclosed to the defense, the result of the proceeding would have been different."

440 Decision at 18 (emphasis added).[9]  However, as respondent notes, Res. Mem. at

55, n. 27, in a decision in 2017, the Supreme Court used the language "reasonable

probability that, had the evidence been disclosed, the result of the proceeding would

have been different," thus suggesting that *Wearry* had not established a new

materiality standard.  *Turner*, 137 S. Ct. at 1893 (emphasis added) (internal

citations omitted); *see also Bellamy v. City of New York,* 914 F.3d 727, 751 (2d Cir.

2019) (employing "would have" rather than "could have" language); *United States v.*

*Lawrence,* 767 F. App'x 77, 81 (2d Cir. 2019) (same).[10]  The 440 Court repeatedly

identified the legal standard used in *Turner* and recent Second Circuit decisions,

and indeed Arroyo's post-hearing submission to the 440 Court also requested that

the 440 Court use the "would have" standard.  440 Decision at 18, 19, 23, 32, 33; S-

---

[9] Arroyo argues and respondent acknowledges that in its initial description of
materiality, the 440 Court mistakenly omitted the "reasonable probability" portion
of the standard.  440 Decision at 18; Res. Mem. at 56.  However, in the next
paragraph and in all other recitations of the standard, the 440 Court identified the
full standard correctly.  It would appear the 440 Court initially omitted the
"reasonable probability" language by mistake or to summarize the standard prior to
engaging in a detailed discussion.  Indeed, its analysis in the very next paragraph
demonstrated that the 440 Court understood that the materiality standard only
required reasonable probability rather than certainty that the verdict would have
been different.  *Cf.* Pet. Mem. at 40 (finding the 440 Court "insist[ed] on certainty").

[10] On reply, Arroyo again asserts that "the key substantive distinction . . . between
the 440 Court's incorrect standard and the correct one, is the lack of any
requirement that a *Brady* claimant show a likelihood that the trial would have had
a different result had the undisclosed evidence been introduced. . ."  Pet. Reply at
14-15.  This contention is impossible to square with the language from *Turner* that
a successful *Brady* claim requires a "reasonable probability that, had the evidence
been disclosed, the result of the proceeding would have been different."  *Turner*, 137
S. Ct. at 1893.

610. As such, the 440 Court did not incorrectly identify the legal standard for materiality, and the Court will therefore apply AEDPA deference to its findings related to the *Brady* claims.

### a. Efforts to Relocate Morrissey's Family

Arroyo first contends that the prosecution violated *Brady* by failing to disclose "evidence [ ] that ADA Kaplan worked—prior to trial—(1) to relocate Morrissey's wife." Pet. Mem. at 29. He argues that such evidence would have impeached Morrissey's credibility because "a jury hearing this evidence reasonably could have concluded that ADA's Kaplan's efforts provided Morrissey with an inducement to testify for the prosecution." *Id.* at 30.

After testifying in another murder case in Bronx County, Morrissey sent a letter to ADA Lisa Mattaway stating: "Please Lisa my wife and son can't go back to [redacted], it's around the corner from Jimenez. . . . Please Lisa move them . . . Please Lisa just get them safe." A-088.

Following this letter, on September 28, 2007, ADA Kaplan met with the Bronx CVAU to discuss "[Morrissey's] wife who is requesting relocation services. . ." A-007. The CVAU representative, Iris Negron, then met with and called Morrissey's wife, wrote a letter of advocacy to the Director of the New York City Housing Authority ("NYCHA"), and called NYCHA to request reconsideration after they denied the wife's application. A-007–08.

On October 27, 2007, Trabulus emailed ADA Kaplan stating that Morrissey had been told his family could not be moved. A-004. He further opined: "My best

guess is Kevin [Morrissey] will not testify unless she and the child are moved." *Id.*
ADA Kaplan promptly spoke with Negron about the email, and then forwarded it to
her and stated: "This is the email I mentioned to you.  Please let me know if in-fact
we are out of options." *Id.*  Thereafter, on November 13, 2007, Negron explained to
Morrissey's wife that she would advocate for one month's rent and security should
she find another apartment.  A-007.  The same day, Trabulus sent an email to the
United States Department of Justice, with whom Morrissey was also cooperating,
seeking further assistance in relocating Morrissey's family, in which he stated:
"ADA [Aaron] Kaplan told me today he will now see if it is possible to go outside
ordinary (NYC housing) channels but says 'don't hold your breath.'  I sense going
outside channels might involve the expenditure of funds from his office's budget
they could be reluctant to spend." A-097.  Ultimately, no financial assistance was
provided to Morrissey's wife, and she moved by herself to a relative's home prior to
the Arroyo trial.  T-112, 169.

As discussed below, the Court finds that the evidence about ADA Kaplan's
efforts to relocate Morrissey's wife was not disclosed, but was neither favorable nor
material.  Therefore, a writ of habeas corpus should not issue based on this claim.

### i.    Evidence about efforts to relocate Morrissey's wife was not disclosed

Respondent appears to admit that the relocation assistance was not disclosed
to Arroyo.  *See* Res. Mem. at 25, n.16 (Though Arroyo's trial counsel "was unaware
of the attempt to relocate Morrissey's family . . . . It was and remains respondent's
position that all other evidence was adequately disclosed").  Respondent has not

21

otherwise provided evidence that the relocation assistance was disclosed.  Thus, Arroyo has satisfied this prong of *Brady*.

### ii. <u>Evidence about efforts to relocate Morrissey's wife was not favorable</u>

The 440 Court found that the foregoing facts were not favorable to Arroyo because ADA Kaplan ultimately did not succeed in moving Morrissey's family, and because both Trabulus and ADA Kaplan testified that Morrissey was willing to testify even if his family could not be moved.  440 Decision at 23.  Arroyo argues that the finding "completely misses the point, and thus represents both an unreasonable determination of the facts and an unreasonable application of *Brady*."  Pet. Mem. at 31.[11]  Arroyo contends that "[e]ven though [the Bronx DA's] efforts failed, the jury reasonably could have inferred that the DA's willingness to assist Morrissey reassured him that his testimony at [Arroyo's] trial was greatly valued and would be rewarded."  *Id.* at 32.  Arroyo further argues that "the jury reasonably could have concluded that Morrissey had a pro-prosecution bias and an incentive to testify 'other than altruism.'"  *Id.* at 35.

To support his contention, Arroyo cites to several cases from other circuits where government witnesses were made to "feel part of the state's team and as a result inclined, out of gratitude, friendship, or loyalty, to testify in support of the prosecution."  Pet. Mem. at 32–33 (quoting *Wisehart v. Davis,* 408 F.3d 321, 324

---

[11] In his reply brief, Arroyo reverses course and claims that "[t]he 440 Court's conclusion that the undisclosed evidence was not favorable is a legal ruling, not a factual finding entitled to deference."  Pet. Reply at 3.

(7th Cir. 2005)).  However, in each of the cases cited by Arroyo, the government

witnesses were provided multiple benefits that they actually received, rather than

attempts to provide a benefit that never came to pass, as is the case here.  Notably,

the full sentence in *Wisehart*, which Arroyo did not include in his submission, is:

"The second way of invoking *Brady* is by showing that although there was no quid

pro quo, the state . . .  had <u>lavished benefits (sex, free long-distance calls, cash, or

what have you)</u> on its witnesses in the hope of making them feel part of the state's

team and as a result inclined, out of gratitude, friendship, or loyalty, to testify in

support of the prosecution."  408 F.3d at 324 (emphasis added).  It cannot be said in

this case that the prosecution "lavished" undisclosed benefits on Morrissey.

    For example, Arroyo cites to the First Circuit's decision in *Drumgold v.

Callahan* where the government arranged for its witness "who was homeless, to

stay at a [ ] hotel in Boston. . . . he never paid a bill, he was permitted to come and

go as he liked, and he was able to charge meals at the hotel restaurant to his room. .

. . In addition, [the witness] testified that, while he was at the hotel, [the

prosecutor] provided him with money upon request: 'If I needed, like, say if I needed

money or something, I would just give him a call, I'd call him, and, you know, he'd

like, drop me off $30, $40, $50.'"  707 F.3d 28, 35 (1st Cir. 2013).  In *United States v.

Boyd*, a Seventh Circuit case cited by Arroyo, prosecutors and paralegals provided

the following benefits to the witnesses: (1) allowing the witnesses, who were in

prison at the time, to make physical contact with their visitors (usually forbidden);

these visitors provided such benefits as passing drugs to the witnesses and having

23

sexual intercourse with them; (2) accepting collect calls from the witnesses and forwarding the calls to outside numbers, resulting in a monetary cost to the government; and (3) developing romantic relationships with the witnesses and giving presents. *United States v. Boyd*, 55 F.3d 239, 244 (7th Cir. 1995). In a Fifth Circuit case cited by Arroyo, the witnesses, who were undocumented immigrants, were given "Social Security cards, witness fees, permits allowing travel to and from Mexico, travel expenses, living expenses, some phone expenses, and other benefits. They were essentially given all, and more, of the benefits they were arrested for trying to obtain illegally—benefits so valuable that they took great risks to obtain them by crossing the border illegally." *United States v. Sipe*, 388 F.3d 471, 488 (5th Cir. 2004).

The circumstances in these cases are a far cry from the assistance that ADA Kaplan and Negron attempted to provide to Morrissey's wife, which ultimately resulted in no actual benefit. While Negron did contact Morrissey's wife on January 18, 2008, the substance of the call was to advise her that "NYCHA does a criminal background check and her criminal past may disqualify her," rather than to continue offering any assistance. A-008. Although Negron informed Morrissey's wife that she would "advocate for one month's rent," further emails between Trabulus and the federal government demonstrated that Trabulus was aware that this was an unlikely event and indeed had been warned by ADA Kaplan not to "hold [his] breath." A-097. The Bronx CVAU never provided any monetary benefit and Morrissey's wife relocated by herself prior to trial. T-220. While Trabulus told ADA

24

Kaplan that his "best guess" was that Morrissey would not testify if his family was not relocated, in the end, Morrissey still testified despite the Bronx DA's failure to relocate his family (leading Trabulus to admit at the 440 hearing that his best guess was incorrect). A-004, T-166. Both ADA Kaplan and Trabulus testified that Morrissey was willing to provide testimony even if his family could not be moved. T-039, 112, 143, 166.

Arroyo contends that "whether the evidence of Kaplan's efforts on behalf of Morrissey's wife is 'favorable' depends on whether [Arroyo] could have impeached Morrissey to good effect with that evidence. Clearly he could have," and "[t]hus the 440 Court misapplied the law and reached an unreasonable view of the facts when it concluded that this evidence was not favorable to [Arroyo]." Pet. Mem. at 35. However, a state court's determination "may not [be] characterize[d] . . . as unreasonable 'merely because [a reviewing court] would have reached a different conclusion in the first instance.'" *Brumfield*, 135 S. Ct. at 2277 (quoting *Wood*, 558 U.S. at 301). Instead, § 2254(d)(2) requires a reviewing court to "accord the state trial court substantial deference. If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* A court could also reasonably find that Morrissey would not have been impeached by the attempted relocation assistance. If the evidence had been presented to the jury, it would also have learned that, despite knowing that the prosecution was previously unable to move his family, Morrissey was still willing to risk placing them in the public eye again

25

by testifying in another murder case.  Because no actual benefit was conferred (let alone lavish benefits) and the need for the benefit ended prior to the trial, at most reasonable minds could disagree about whether such evidence was favorable.  Thus, the 440 Court's finding that the attempted relocation assistance was not favorable should not be overturned.

### iii.    Evidence about efforts to relocate Morrissey's wife was not material

The 440 Court found that there was no reasonable probability that the outcome of the trial would have been different if the jury had been aware of the attempted relocation assistance provided to Morrissey's family because the jury knew about Morrissey's "convictions, his aliases, his federal 'cooperation,' the cooperation on another Bronx homicide (Jimenez) and his knowledge of other homicides," as well as the details of the cooperation agreement; thus, Morrissey had been effectively impeached.  440 Decision at 32–33.  The 440 Court further observed that "the case against Mr. Arroyo, although circumstantial, was strong, even without Morrissey's testimony."  *Id.* at 33.  Thus, it concluded that the attempted relocation assistance was not material.

Arroyo contends that the 440 Court failed to recognize that "ADA Kaplan's agreement to help relocate Morrissey's wife is of a different nature altogether than the other impeachment evidence available to [Arroyo]."  Pet. Mem. at 41.  He maintains that "withheld evidence of a 'different kind' than disclosed evidence is more likely to be material."  *Id.* (quoting *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005)).  He also argues that "Morrissey provided the only direct evidence of

26

[Arroyo's] guilt, making him an obviously crucial component of the case."  Pet. Reply. at 18–19.

In deciding whether the withheld evidence was material, the Court considers whether Morrissey had already been impeached such that additional impeachment material would have been cumulative, and whether the additional evidence undermined confidence in the jury's verdict.  In order to overturn the 440 Court's decision, the Court must be convinced that it was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Woods*, 136 S. Ct. at 1151 (citation omitted).

With regard to impeachment evidence, the Second Circuit has held that "[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial."  *Jackson*, 695 F. App'x at 607 (citing *Persico*, 645 F.3d at 111).  For example, in *Persico,* the Second Circuit affirmed the district court's finding that undisclosed impeachment evidence of a witness was immaterial, since "defendants possessed—and used—other grounds to attack her credibility."  645 F.3d at 112 (evidence that witness was allowed to keep $1.65 million deemed immaterial because witness already impeached by manifest antipathy toward defendants and internally inconsistent testimony).  Similarly, in *Shabazz v. Artuz,* the Second

27

Circuit found that the government witnesses' expectation of receiving favorable treatment for their testimony was not material because the witnesses had already been impeached by their drug use and previous lies. 336 F.3d 154, 167 (2d Cir. 2003). Finally, in *Gonzalez v. United States*, the Second Circuit found that undisclosed Civilian Complaint Review Board complaints against the sole eyewitness at trial were not material since the witness had been thoroughly impeached with prior inconsistent statements and his motive to lie. 667 F. App'x 307, 308 (2d Cir. 2016). Thus, prior Second Circuit cases have demonstrated that even evidence of a different kind may be considered cumulative and thus not material if the witness had already been thoroughly impeached.

In this case, Morrissey's credibility had already been significantly undermined with the evidence Arroyo used to impeach him at trial. For example, he admitted that he was facing up to 35 years in prison, and that, as a result of his cooperation, he faced two to four years in prison instead (much of which he had already served). TR at 521–22. He testified to having been convicted of more than 20 financial crimes, which involved fraudulent activities bearing on his trustworthiness. *Id.* at 472–73. He acknowledged that he was currently facing charges in five counties for grand larceny. *Id.* at 472. He testified that he had been a cooperating witness in "could be ten" other cases, at least one of which had already resulted in a conviction. *Id.* at 524. He also admitted to using other inmates' pin numbers to make unauthorized telephone calls. *Id.* at 526–27. Morrissey's credibility had thus already been thoroughly attacked in multiple ways.

28

Furthermore, respondent observed at oral argument that the trial court had charged circumstantial evidence to the jury. OA at 45; *see* TR at 656 (ADA Kaplan requesting circumstantial evidence charge); *id.* at 769 (The court charged: "Now there are two types of evidence, namely direct evidence and circumstantial evidence. In this case the People contend that there is circumstantial evidence of the defendant's guilt."). Respondent argued that when there is direct evidence testimony of a defendant's guilt, the court does not normally also charge circumstantial evidence; thus the circumstantial evidence charge demonstrates that the court, the parties, and the jury were aware that Morrissey's direct evidence testimony was problematic. OA at 45. Respondent further contended that Morrissey's credibility was so undermined that Arroyo, in summation, called him a "rent a witness" and "con man" without objection. *Id.* at 43, 55, 60; *see* TR at 684–85. Accordingly, given the overwhelming impeachment evidence against him, the 440 Court's finding that Morrissey had already been impeached and any further impeachment material, even if of a different kind, would be cumulative is not an unreasonable application of law.

In addition, though Arroyo rightly contends that a purported confession is a powerful form of evidence (Pet. Reply at 15–16), the circumstantial evidence in this case was strong. "[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence." *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994); *see also Tatum v. Lempke,* 481 F. App'x 659, 661 (2d Cir. 2012) ("Circumstantial evidence is not a disfavored form of proof and, in fact, may be

stronger than direct evidence when it depends upon 'undisputed evidentiary facts
about which human observers are less likely to err . . . or to distort.'") (quoting
*People v. Geraci,* 85 N.Y.2d 359, 369 (1995)); *Maldonado v. Scully,* 86 F.3d 32, 35–36
(2d Cir. 1996). The evidence at trial, considered in the light most favorable to the
verdict, established that Arroyo had threatened Alvarado's life on multiple
occasions prior to her murder and several witnesses testified to their tumultuous
relationship. TR at 41, 301, 383. Arroyo was seen the evening of November 17 with
Alvarado around midnight and was seen exiting the bedroom the morning of
November 18 by Alvarado's mother. *Id.* at 305–06, 307–09. A medical examiner
testified that Alvarado had likely died sometime in that period. *Id.* at 577.
Alvarado had no defensive wounds and was murdered in the same way that Arroyo
had previously threatened. *Id.* at 41–42, 579. There was no sign of forced entry or
exit to the house, and Arroyo, Alvarado, and her mother were the only persons with
keys to the home. *Id.* at 168–69, 310. Based on the evidence presented at trial, the
440 Court's finding that "there was overwhelming circumstantial evidence of guilt,"
is not unreasonable. 440 Decision at 20. Given all the evidence presented against
Arroyo and the multiple issues with Morrissey's credibility that the jury was
already aware of, the additional impeachment evidence against Morrissey is not
sufficient to "undermine confidence" in the verdict. *Turner*, 137 S. Ct. at 1893;
*Wearry*, 136 S. Ct. at 1006.

For all these reasons, the 440 Court's determination that the prosecution did
not violate *Brady* with respect to the relocation efforts was not unreasonable.

### b.    <u>Communications with Other Jurisdictions</u>

Arroyo further contends that the prosecution violated *Brady* by failing to disclose "evidence that ADA Kaplan worked—prior to trial—. . . to assist Morrissey in his quest for more lenient sentences in jurisdictions other than Kings County, including Queens County." Pet. Mem. at 29. He argues that "[t]he jury had no way of knowing that Morrissey was likely (or even that it was *possible* for Morrissey) to receive *Willard* (and not prison) in every jurisdiction, or that Morrissey had successfully importuned the Bronx DA to make calls ensuring that possibility before he took the stand." Pet. Reply at 18.

On January 7, 2008, ADA Kaplan executed a cooperation agreement between the Bronx DA's Office and the Kings DA's Office regarding Morrissey's testimony. The agreement included the following provision:

> 7. These Offices agree that, at such time as the Bronx DA determines that KEVIN MORRISSEY has provided full and complete cooperation and / or truthful testimony against Felipe Arroyo and that such cooperation and /or testimony are no longer needed in any matter against Felipe Arroyo, the Bronx DA will make the nature and extent of KEVIN MORRISSEY's cooperation known to the Kings DA and / or Court and recommend that KEVIN MORRISSEY receive a lesser sentence of 2-4 years incarceration, or the *Willard* Program (through the New York State Department of Correction and / or New York State Parole Board), to run concurrently with KEVIN MORRISSEY'S terms of incarceration to be served in Queens County, and being served in Nassau County and Suffolk County, the length and nature of that sentence to be determined by the Honorable Judge presiding in Kings County, based upon the nature and extent of KEVIN MORRISSEY's cooperation."

A-113–14.

On January 10, 2008, a few weeks prior to trial, Trabulus emailed ADA Kaplan stating: "Kevin [Morrissey] is supposed to be sentenced in Queens on the 17th. He pled before Judge McKay in Brooklyn with a promise of 2-4, *Willard*. Apparently, in Queens, *Willard* is not certain. Kevin asked me to ask you to contact Queens, [ADA] Alison Wright, to ensure he gets *Willard* there too, if you have not already done so." A-116. ADA Kaplan responded: "I'll certainly contact her, especially since I thought he took an OPEN plea in Queens and would NOT be sentenced in Queens until after my Bronx case is concluded . . . I'll double check with the Kings ADA about the 'promise' on that plea b/c the agreement does NOT say he'll get *Willard* per se (it's an 'or')." *Id.* ADA Kaplan later emailed: "Just spoke with the Queens ADA and she's aware of all the *Willard* stuff but thinks it's somewhat a moot point right now (until the time comes to actually sentence him, after he's done here). I had to agree with her, but at least we had a substantive conversation about it and agreed to continue it once the time comes to sentence Kevin." A-118. Trabulus then replied: "I got your phone message and appreciate your patience and understanding, as well as understand your exasperation. Irrational though it may be, this guy actually feared that he would somehow be sentenced prematurely in Queens, perhaps something his lawyer there said made him feel that way. Anyway, what you emailed to me previously reassured him, as this should." *Id.*

ADA Kaplan also testified at the 440 hearing that he had spoken with prosecutors in Suffolk and Nassau, although he had no recollection of what he discussed with them.  T-080–81.

As discussed below, the Court finds that the evidence about ADA Kaplan's communications with other jurisdictions was not disclosed, was favorable, but was not material.  Therefore, a writ of habeas corpus should not issue based on this claim.

### i.    Evidence about communications with other jurisdictions was not disclosed

The 440 Court found that evidence about communications with other jurisdictions was disclosed because "[t]here [was] no evidence that trial counsel was unaware of the parameters of the agreement or that *Willard* was a possibility in other jurisdictions."  440 Decision at 28.  Respondent contends that trial counsel, "exercising due diligence, would be expected to have ordered the plea minutes on the disclosed pending cases . . . wherein he would have found references in each to the *Willard* Program, thereby calling his attention to the fact that many jurisdictions considered it a possibility."  Res. Mem. at 37.  Respondent further argues that when a defendant faces multiple charges in different jurisdictions, all the courts must agree on a *Willard* sentence in order for a defendant to receive it.  *Id*. at 39–40 (citing NYCPL § 410.95).  Therefore, respondent claims that because the cooperation agreement with the Kings DA's Office, which was disclosed, included the possibility of *Willard* in Kings County, defense counsel should have known that Morrissey "was not only seeking to obtain diversion in one jurisdiction,

33

but had to be seeking it in all." *Id.* at 41.  Thus, respondent contends that the ADA

"accurately disclosed Morrissey's intention to enter the *Willard* Program." *Id.* at 37.

However, while the possibility of a *Willard* sentence for Morrissey in all

jurisdictions may have been disclosed, the actions taken by ADA Kaplan when

Morrissey asked him to "ensure he gets *Willard*" were not.  A-116.  The cooperation

agreement disclosed that Morrissey could receive two to four years in prison or a

*Willard* sentence.  Conversely, the emails and phone calls between ADA Kaplan and

Trabulus demonstrate that: (1) Morrissey very much wanted to receive a *Willard*

sentence; (2) Morrissey was worried about not receiving *Willard* in Queens, thereby

removing the possibility in all jurisdictions; (3) Morrissey made that worry known

to ADA Kaplan; (4) ADA Kaplan immediately acted based on that worry; and (5)

ADA Kaplan promised to continue conversations about the *Willard* sentence with

other jurisdictions not included in the disclosed cooperation agreement.  Such

information was not disclosed by the cooperation agreement or by the plea minutes

in Morrissey's pending cases.[12]

### ii.   Evidence about communications with other jurisdictions was favorable

The 440 Court found that evidence about communications with other

jurisdictions was not favorable to Arroyo because ADA Kaplan testified that he did

not request a specific sentence in any other jurisdiction and any conversations that

---

[12] Respondent contends that the plea minutes from Kings, Queens, and Suffolk Counties contained references to the *Willard* Program, but does not provide citations to such references.

ADA Kaplan had with other jurisdictions about the *Willard* Program were "logistical in nature." 440 Decision at 28. Arroyo argues that this finding was unreasonable because ADA "Kaplan himself described his discussions with the Queens DA prior to Morrissey's testimony as 'substantive,' and made clear that those discussions would 'continue' in the future (after Morrissey's testimony)." Pet. Mem. at 36 (quoting A-118). Furthermore, "[the communication with Queens] was something that [Morrissey] *wanted* and *requested*," and ADA Kaplan acceded to that request. Pet. Reply at 8.

Respondent contends that the calls were merely logistical and ADA Kaplan "had to speak to Queens County in light of the cooperation agreement he signed. The People have an obligation not to make illusory promises to their cooperating witnesses that cannot be fulfilled." Res. Mem. at 42–43. Respondent thus argues that because the cooperation agreement with the Kings DA included the possibility of *Willard*, ADA Kaplan had to ensure *Willard* was a possibility in all jurisdictions or he would have had to modify the agreement. However, the cooperation agreement provided that the Bronx DA's Office would recommend the *Willard* Program or "a lesser sentence of 2-4 years incarceration." A-113; *see also* Pet. Reply at 11–12. If Morrissey did not receive *Willard* in Queens and could therefore not receive *Willard* in Kings, then the Bronx DA's Office would recommend two to four years in prison in Kings County and could have told Morrissey as such. ADA Kaplan did not "need to contact Queens prior to trial" and the cooperation

agreement with the Kings DA did not need to be modified in light of Morrissey's concerns.  Res. Mem. at 39.

Rather, the emails between ADA Kaplan and Trabulus demonstrate that Morrissey was particularly interested in receiving a *Willard* sentence and made that interest known to ADA Kaplan by asking him to "ensure he gets *Willard* [in Queens] too."  A-116.  ADA Kaplan then immediately called the Queens DA and reported to Trabulus and Morrissey that the Queens DA was "aware of all the *Willard* stuff but thinks it's somewhat a moot point right now . . . <u>I had to agree with her, but at least we had a substantive conversation about it and agreed to continue it once the time comes to sentence Kevin</u>."  A-118 (emphasis added).[13]  If ADA Kaplan merely intended to verify *Willard* "was not already off-the-table" and learned that the Queens DA had not taken it off-the-table, there was no need for him to then agree to continue the conversation about *Willard* in the future and inform Morrissey that he would do so.  Res. Mem. at 43.[14]

---

[13] Notably, the underlined section of the email was not cited in respondent's brief.

[14] In response to ADA Kaplan's email, Trabulus stated: "Aaron – I got your phone message and appreciate your patience and understanding, as well as understand your exasperation.  Irrational though it may be, this guy actually feared that he would somehow be sentenced prematurely in Queens, perhaps something his lawyer there said made him feel that way.  Anyway, what you emailed to me previously reassured him, as this should."  A-118.  Arroyo contends that ADA Kaplan's actions reassured Morrissey about the possibility of receiving *Willard* in Queens.  Respondent contends that the email only "reassured Morrissey he would not be sentenced prematurely."  Res. Mem. at 42.  The Court finds that reasonable minds could disagree as to whether ADA Kaplan's calls to Queens only assuaged his "fear[] that he would somehow be sentenced prematurely in Queens" rather than reassured him about receiving a *Willard* sentence in Queens, and thus has not factored that language into its analysis.  A-118.

At the trial, Morrissey described the *Willard* Program in general terms and stated simply that it was part of his cooperation agreement with Kings County.  TR at 478–79.  He testified that in Queens, he would receive the minimum sentence of two to four years concurrently if he cooperated.  *Id.* at 481.  He did not mention the possibility of receiving a *Willard* sentence in Queens.  On the other hand, the information revealed in the emails between ADA Kaplan and Trabulus would have demonstrated to the jury that Morrissey was particularly interested in the *Willard* Program, he worried about not receiving *Willard* in Queens, and ADA Kaplan had communications with Queens on his behalf about *Willard* and stated he would continue the conversation.  Such information clearly constitutes impeachment evidence as it would demonstrate Morrissey's goal of receiving *Willard* in all jurisdictions and that ADA Kaplan had told Morrissey he would continue communicating with other jurisdictions regarding *Willard* after Morrissey had testified.  Thus, the Court finds that ADA Kaplan's communications with other jurisdictions was favorable.

### iii.  Evidence about communications with other jurisdictions was not material

However, as described in the previous section, the 440 Court found that "[t]here was no reasonable probability or possibility that the result of the trial would have been different if the jury heard all or even some of this information."  440 Decision at 33.  Because Morrissey had already been effectively impeached by evidence presented at trial and there was strong circumstantial evidence of Arroyo's guilt, the 440 Court found that ADA Kaplan's communication with other

37

jurisdictions was not material evidence.  Based on the analysis in the previous

section, *see supra* II(B)(1)(a)(iii), the Court finds that the 440 Court's determination

that the prosecution did not violate *Brady* with respect to the communications with

other jurisdictions was not unreasonable as the additional impeachment evidence

does not "undermine confidence" in the jury's verdict.[15]

### 2.    *Napue* Claim

The government "may not knowingly use false evidence, including false

testimony, to obtain a tainted conviction."  *United States v. Alston*, 899 F.3d 135,

146 (2d Cir. 2018) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  Thus, "a

conviction obtained through use of false evidence, known to be such by

representatives of the State, must fall under the Fourteenth Amendment," and the

"same result obtains when the State, although not soliciting false evidence, allows it

to go uncorrected when it appears."  *Napue*, 360 U.S. at 269 (internal citations

omitted).  "If the prosecution 'knew or should have known of [a witness's] perjury, a

new trial is warranted if there is any reasonable likelihood that the false testimony

could have affected the judgment of the jury.'"  *Alston*, 899 F.3d at 146 (quoting

---

[15] In this case, the undisclosed evidence of sentencing benefits was of the same kind
as the disclosed evidence in the cooperation agreement, which Arroyo acknowledges
in part. Pet. Reply at 17.  Furthermore, during Morrissey's direct testimony,
ADA Kaplan asked: "Mr. Morrissey, as far as you understand, is the *Willard* drug
program through parole incorporated within the agreement that you signed
between the district attorney of the Bronx and the district attorney of Brooklyn?"
TR at 479.  Morrissey responded: "It was listed there as well as the maximum."  *Id.*
Morrissey testified to the jury that he expected to receive a *Willard* sentence rather
than stating it was one of the possibilities in his cooperation agreement.  *See* Res.
Mem. at 38–39.  Thus, further testimony on the subject would have been
cumulative.

*United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996)); *see also United States v. Agurs,* 427 U.S. 97, 103 (1976) ("[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").  At the same time, "a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness." *Drake v. Portuondo*, 553 F.3d 230, 245 (2d Cir. 2009) (citing *Shih Wei Su v. Filion,* 335 F.3d 119, 127 (2d Cir. 2003)).

To establish a *Napue* violation, the Court must ask: "(1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in *Agurs*." *Shih Wei Su*, 335 F.3d at 127.

Arroyo contends that the prosecution violated *Napue* by failing to correct Morrissey's false testimony about how his testimony would affect his New Jersey case.  Pet. Mem. at 45.  He argues that Morrissey and ADA Kaplan knew the cooperation agreement with Kings County required ADA Kaplan to "report the nature and extent of Kevin Morrissey's cooperation to other law enforcement or judicial authorities as requested." *Id.* (quoting A-113).  On re-direct examination, however, Morrissey replied, "None whatsoever," to the question, "Do you have any idea whether or not what you do in this courtroom has any relationship to Bergen County?"  TR at 529.  ADA Kaplan did not correct this testimony.

As discussed below, the Court finds that Morrissey's testimony about Bergen County was false, should have been known to be false, and went uncorrected, but that defense counsel should have exercised due diligence to correct the testimony and in any case the testimony was not prejudicial. Therefore, a writ of habeas corpus should not issue based on this claim.

### a. **Morrissey's testimony about Bergen County was false, ADA Kaplan should have known it was false, and the false testimony went uncorrected**

In its decision, the 440 Court acknowledged that "[t]he only expectation [in relation to Bergen County] was that ADA Kaplan provide New Jersey with the information that Morrissey had testified in Bronx County, which is consistent with the cooperation agreement." 440 Decision at 31. Having reached such a conclusion, the 440 Court then found that "the People were under no obligation to correct any of Morrissey's testimony at trial." *Id.* at 32. Based on the 440 Court's own interpretation of the cooperation agreement, however, Morrissey's answer to the question: "Do you have any idea whether or not what you do in this courtroom has any relationship to Bergen County?" should have been "ADA Kaplan [will] provide New Jersey with the information that [I] had testified in Bronx County," not "None whatsoever." TR at 529; 440 Decision at 31.[16] The plain language of paragraph 12

---

[16] Respondent contends that Morrissey's answer was ambiguous and he "likely meant he had 'no idea' whatsoever whether a relationship exists between his testimony and Bergen County." Res. Mem. at 49. However, the cooperation agreement, which was signed by Morrissey, clearly states that "as requested," "these Offices [Kings and Bronx DA] agree to report the nature and extent of KEVIN MORRISSEY's cooperation to other law enforcement or judicial

40

of the cooperation agreement demonstrates that there was a relationship between Morrissey's testimony and Bergen County—that ADA Kaplan would report the nature and extent of his cooperation after the trial. A-114. Indeed, ADA Kaplan ultimately did report Morrissey's cooperation in both the Arroyo and Jimenez cases to Bergen County at Morrissey's request. A-217, 372–73. Thus, Morrissey's testimony was false.

Furthermore, as ADA Kaplan drafted and signed the cooperation agreement on behalf of the Bronx DA's Office, he should have known that Morrissey's testimony was false. A-115. The testimony was neither corrected by ADA Kaplan nor defense counsel. Accordingly, the Court finds that Morrissey's testimony was false, that the ADA should have known it was false, and that it went uncorrected.

### b. <u>Defense counsel should have corrected Morrissey's testimony on re-cross examination</u>

However, even though Morrissey gave false testimony and ADA Kaplan should have known it was false, "a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness." *Drake*, 553 F.3d at 245 (citation omitted). As Arroyo's defense counsel had access to the cooperation agreement, which plainly stated ADA Kaplan's duties to report

---

authorities." A-114. Thus, Morrissey should have had an idea about the relationship between his testimony and Bergen County.

Respondent further contends that because ADA Kaplan never promised that Morrissey would receive any benefit in Bergen County for his testimony, Morrissey's testimony was not false. Res. Mem. at 50. However, ADA Kaplan's question to Morrissey was whether his testimony had "any relationship to Bergen County," not whether it would result in any benefit in Bergen County. TR at 529.

41

Morrissey's testimony to Bergen County, he should have been aware that Morrissey's testimony was false and should have corrected it on re-cross examination.

The Second Circuit has found that defense counsel's obligation to rebut a prosecution witness does not extend to cases where "the prosecutor engages in conduct designed to inhibit the defense in this regard, for example, by objecting to efforts at impeachment, bolstering false testimony in summation, or, as in this case, contriving a scheduling crisis. . . ." *Id.* Arroyo has not alleged such misconduct in this case. Instead, Arroyo contends that "generally, a defendant is not required to 'run [] the risk of implicating the credibility of the prosecutor before the jury.'" Pet. Mem. at 46 (citing *Shih Wei Su*, 335 F.3d at 128, n.4). According to Arroyo, because ADA Kaplan "'was directly involved as a participant in the transaction about which the witness has allegedly lied' and at least some aspects of the relationship between Morrissey's testimony and his New Jersey case were not disclosed, the prosecution was not relieved of its duty under *Napue*." *Id.* (citing *Shih Wei Su*, 335 F.3d at 128, n.4.).

The Second Circuit's decision in *Shih Wei Su*, relied on heavily by Arroyo, is distinguishable from this case. In *Shih Wei Su*, the prosecution had reached a sentencing deal with its cooperating witness. 335 F.3d at 128. Yet prior to trial the prosecutor denied that an agreement had been made, and on direct examination elicited from the witness that he had received no sentencing promises. *Id.* The defense counsel therefore only had "some information that a deal *might* have been

42

made." *Id.* The Second Circuit found in that case that it would have "involved enormous tactical danger" for defense counsel to "risk opening the door to adverse testimony concerning a sentencing agreement from a government witness on the chance that the prosecutor had both intentionally mischaracterized that witness's dealings with the government before trial and knowingly elicited false testimony denying that an agreement had been made." *Id.* Because the defense counsel had incomplete knowledge about the sentencing deal and the prosecutor had stated there was no deal, the Second Circuit found it unreasonable "to fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar." *Id.*

In this case, defense counsel had access to the cooperation agreement and thus knew that ADA Kaplan was required to report to Bergen County if Morrissey so requested. ADA Kaplan provided the agreement to defense counsel prior to trial and acknowledged that the agreement had been made. Furthermore, on direct examination, Morrissey made the jury aware that he was still incarcerated in all his other cases and had yet to plead guilty in Bergen County or to be sentenced in New York jurisdictions because he was "awaiting [his] testimony on [the Arroyo case]." TR at 476. Because defense counsel had knowledge of the cooperation agreement and ADA Kaplan's reporting requirements, and Morrissey himself had previously stated that there was some relationship between his testimony and Bergen County, defense counsel could have corrected Morrissey's testimony on re-cross examination without assuming that ADA Kaplan had lied. Because the narrow exception

43

provided in *Shih Wei Su* does not apply in this case and defense counsel should have corrected Morrissey's testimony, the Court finds that, for purposes of habeas review, *Napue* was not violated.

### c. **The testimony was not prejudicial**

Even if defense counsel had no obligation to correct it, Morrissey's false testimony about Bergen County was not prejudicial.[17]  The cooperation agreement provided that the Kings and Bronx DA's Offices would report Morrissey's cooperation to other jurisdictions but also stated that the agreement "cannot bind other State, Federal or local prosecuting authorities." A-114.  The cooperation agreement did not promise any benefit to Morrissey for his testimony other than a recommendation of the minimum sentence in Kings County.  In addition, ADA Kaplan testified at the 440 hearing that he communicated with Bergen County after Morrissey's testimony to provide logistical coordination for Morrissey's production in Bergen County rather than to advocate for a lesser sentence.  T-105 ("[T]he procedure when a witness is no longer needed and another jurisdiction is interested in him" is to "notify that jurisdiction that the witness or defendant, whoever it is we

---

[17] Arroyo correctly notes that the 440 Court did not cite to any cases in its discussion of the *Napue* claim.  He contends the 440 Court's decision "gives no reason to think that it applied to [Arroyo's] *Napue* claim a different standard than the incorrect standard it applied to [Arroyo's] *Brady* claim." Pet. Mem. at 46, n.11. For a *Napue* claim, "the clearly established Supreme Court precedent" is that a conviction must be set aside if there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Drake*, 553 F.3d at 241 (emphasis added); *cf. Turner*, 137 S. Ct. at 1893 ("would have" standard for *Brady*). However, under this standard, Arroyo was not prejudiced by Morrissey's false testimony.

have in custody, is no longer needed, is not going to be kept here or we're done with him, so to speak."); *see also* A-217 (email from Trabulus to ADA Kaplan requesting ADA Kaplan send letter "to help <u>expedite Morrissey's production</u> to Bergen [C]ounty to resolve his case there.") (emphasis added).

Furthermore, as previously discussed, *see supra* section II(B)(1)(a)(iii), Morrissey's credibility had already been undermined by all the other sentencing benefits he had received as a result of his cooperation, as well as his history of fraudulent criminal activity.  Accordingly, Morrissey's false testimony was not prejudicial to Arroyo.  The Court thus finds that the 440 Court's determination that the prosecution did not violate *Napue* was not unreasonable.

### 3.   <u>Ineffective Assistance of Counsel Claim</u>

To prevail on a claim of ineffective assistance of counsel, a petitioner must satisfy the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984).  To do so, he must "(1) show that his counsel's representation 'fell below an objective standard of reasonableness' and (2) 'affirmatively prove prejudice.'"  *United States v. Rosa*, 666 F. App'x. 42, 44 (2d Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88).  "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Strickland*. 466 U.S. at 697.

Under *Strickland's* first prong, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.  In evaluating counsel's effectiveness, courts

must assess the case from the viewpoint of the attorney at the time of the challenged conduct or omission. *See, e.g.*, *Lockhart v. Fretwell,* 506 U.S. 364, 371–72 (1993). Rather than strictly scrutinizing an attorney's every decision, courts must focus on whether counsel's behavior was so unreasonable as to represent a "breakdown in the adversarial process that our system counts on to produce just results." *Strickland,* 466 U.S. at 696. "[T]he record must demonstrate that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Wilson v. Mazzuca,* 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland,* 466 U.S. at 687). Courts must consider "'the totality of the evidence before the judge or jury' in judging counsel's performance." *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 695). "[I]t is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Clark v. Stinson,* 214 F.3d 315, 322 (2d Cir. 2000) (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)) (citing *Jones v. Barnes,* 463 U.S. 745, 754 (1983)); *see also Chrysler v. Guiney,* 806 F.3d 104, 118 (2d Cir. 2015).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Rosario v. Ercole,* 601 F.3d 118, 129–30 (2d Cir.

2010) (internal citations and quotation marks omitted).  However, "omissions [that] cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness," may constitute an error that deprived the defendant of his constitutional right to counsel.  *Wilson*, 570 F.3d at 502 (quoting *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003)).

If a court finds that counsel was deficient, under *Strickland*'s second prong, a petitioner then must establish that he was prejudiced as a result.  *Strickland,* 466 U.S. at 692.  To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Finally, in the context of the AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard."  *Harrington*, 562 U.S. at 101.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id.* (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).  Given that the "standards created by *Strickland* and § 2254(d) are both highly deferential, . . . when the two apply in tandem, review is doubly so."  *Id.* at 105 (internal citations and quotation marks omitted).

### a.   Trial Counsel's failure to investigate and use Morrissey's psychiatric history was not prejudicial

Arroyo contends that he was deprived of his constitutional right to effective assistance of trial counsel because counsel failed to uncover Morrissey's mental health history and present such evidence to the jury.  Pet. Mem. at 49.  His appellate counsel, after reviewing Morrissey's prior convictions in court files, found several references to Morrissey's mental illnesses.  *Id.* at 15.  For example, in 1993, Morrissey told the judge in his criminal case "that he was taking '11 different medications to control [his] mental illness.'"  *Id.* (citing S-234).  Morrissey also wrote letters to various federal judges claiming that "another person" named "Ray Sanchez" lived "inside his body" and "only [Ray Sanchez]" was "doing all these bad illegal things."  *Id.* at 16 (citing S-154, S-156).  In addition, the 440 Court itself observed that "the court jacket from [Morrissey's 2007 conviction in Queens] reflected that Morrissey was examined in a February 2007 competency hearing."  440 Decision at 16.[18]

The 440 Court determined that Arroyo was not prejudiced by trial counsel's failure to impeach Morrissey based on his medical history because "[i]mpeachment

---

[18] Arroyo's appellate counsel also discovered an "After Care Letter" in court records from Morrissey's 2007 conviction in Queens, which stated that Morrisey had "Schizophrenia" and had been prescribed the drug Zyprexa.  S-212, S-235.  However, during oral argument, respondent explained that such a letter should not have been in court records as it contained confidential medical information, and any defense counsel would not have expected to find such a letter.  OA at 38–39; *see also* Res. Mem. at 65, n. 32 (citing New York Mental Hygiene law, Article § 33.13(c)(1) and 42 CFR 2.65).  The Court will thus not consider the failure to locate the After Care Letter as evidence of any error by trial counsel.

on this topic would have had little value revealing only that Morrissey was not psychotic, or delusional but a manipulator, something defendant's trial counsel cross examined him extensively about and highlighted in his summation." 440 Decision at 17. The 440 Court also listed the many actions that trial counsel had taken on behalf of Arroyo and found that he had otherwise provided "meaningful representation." *Id.* at 35–36.

Under *Strickland's* second prong, "there [must be] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough,* 541 U.S. at 664). As discussed previously, the 440 Court found that Morrissey had already been cross-examined extensively and to great effect, and the circumstantial evidence against Arroyo was strong. 440 Decision at 19–20. "[W]here a conviction is 'supported by overwhelming evidence of guilt,' habeas relief on the ground of ineffective assistance is generally not warranted." *Waiters v. Lee*, 857 F.3d 466, 480 (2d Cir. 2017) (quoting *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001)). "This is because a verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than 'a verdict or conclusion only weakly supported by the record.'" *Id.* (quoting *Strickland*, 466 U.S. at 696). For the reasons discussed previously and, given the doubly deferential standard for ineffective assistance of counsel claims, the 440 Court's

determination that Arroyo was not prejudiced by trial counsel's failure to find and employ Morrissey's history of mental illness was not unreasonable.

### b. **Trial counsel's performance was not deficient**

In determining whether trial counsel's performance was deficient, the 440 Court observed: "The court counts more than 15 calendar appearances on behalf of this defendant . . . [counsel] delivered an opening statement, conducted vigorous cross examination of multiple witnesses, including the cooperating witness in the case . . . He voiced numerous objections, made legal arguments regarding multiple evidentiary issues throughout both the hearing and trial and delivered a cogent and thorough summation." 440 Decision at 35. Thus, the 440 Court found that trial counsel's representation was not deficient. Nonetheless, the "right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Arroyo argues that trial counsel's failure to discover Morrissey's psychiatric history and thus his inability to use it at trial constitute substantial errors. Pet. Mem. at 50–51.

Having determined that Arroyo was not prejudiced by his trial counsel's failure to find and impeach Morrissey on his history of mental illness, the Court need not assess whether trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 697. However, for completeness, the Court also finds that trial counsel's performance was not deficient.

Arroyo argues that the evidence of Morrissey's mental illness was readily available. Pet. Mem. at 49. As the 440 Court observed: "Defendant had an opportunity to become aware of defendant's possible mental illness from another source that his trial counsel <u>clearly knew about</u>. Counsel cross-examined Morrissey about a case that was pending against him in Queens County at the time of defendant's trial." 440 Decision at 15–16 (emphasis added). In that case, the public court file reflected that Morrissey was examined in a competency hearing. Arroyo also contends that if trial counsel had simply researched Morrissey's convictions from the 1990s on PACER, he would have easily found multiple references to mental illnesses. OA at 30–31, 67–68. Arroyo maintains that any reasonable trial counsel would have researched the criminal history of the government's star witness and found such references. *Id.* at 68.

Respondent counters that, given the wealth of information available to impeach Morrissey, trial counsel had "no reason or need to investigate Morrissey's background further." Res. Mem. at 71 (citing *Rompilla v. Beard*, 545 U.S. 374, 382–83 (2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.")). Given the already impressive volume of impeachment material available against Morrissey, respondent contends that trial counsel made a strategic decision to focus on other forms of trial preparation rather than continue to gather evidence that would have been cumulative. *Id.* Respondent further argues that Arroyo had the opportunity to question trial counsel about his trial strategy, but chose not to. OA at 36. Under

*Strickland*, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689.  Respondent maintains that trial counsel's decision not to research further was sound trial strategy, and Arroyo has not overcome his burden to prove otherwise.  Res. Mem. at 71.  Given the voluminous impeachment evidence against Morrissey that trial counsel put to use, the Court finds that trial counsel's performance may well have been affected by strategic decisions he chose to make and it was therefore not unreasonable for the 440 Court to conclude it was not deficient.[19]

---

[19] The 440 Court did err in finding that information related to Morrissey's mental illness would not have been valuable as impeachment evidence.  440 Decision at 17. It was aware of the After Care Letter included in Morrissey's 2007 Queens court file, which reflected that he had been diagnosed as schizophrenic and prescribed medication, and nevertheless found that "[t]he only evidence that Mr. Morrissey may have had a mental health history stems from his own self reporting in the 1990s." *Id.* at 18.  Thus, the 440 Court unreasonably discounted a more recent diagnosis from a medical professional who had determined that Morrissey's condition necessitated medication.  Trial counsel himself admitted that "[h]ad [he] known this information [about Morrissey's psychiatric history], [he] would have used it in cross-examination to try and discredit Morrissey's assertion that Arroyo had confessed to him."  S-218.  In addition, even if a jury had concluded that Morrissey was merely a "faker" or "malingerer" (440 Decision at 15), such information would also constitute valuable impeachment material, demonstrating that Morrissey was willing to manipulate his health history for his own benefit and to lie in a court of law.  Ultimately, however, given the amount of evidence already available concerning Morrissey's credibility and the strength of the evidence against Arroyo, there is no reasonable probability that "the result of the proceeding would have been different" had trial counsel presented this additional material. *Strickland*, 466 U.S. at 694.

III.    **CONCLUSION**

For the foregoing reasons, I recommend that Arroyo's petition for a writ of habeas corpus be denied.

**PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections (plus three days because the Report is being mailed to Petitioner). *See* Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Gardephe.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 28, 2020
       New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

53